601 So.2d 529 (1992)
Robert BRYANT, Appellant,
v.
STATE of Florida, Appellee.
No. 75317.
Supreme Court of Florida.
March 19, 1992.
Rehearing Denied July 23, 1992.
Nancy A. Daniels, Public Defender and David A. Davis, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Richard B. Martell, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Robert Bryant appeals his convictions of first-degree murder, sexual battery, burglary, and attempted robbery and his sentence of death for the first-degree murder conviction. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm Bryant's convictions and sentences except for the sentence of death. We find that errors committed in the trial of this cause require a new penalty phase proceeding before a new jury for the first-degree murder conviction.
On June 4, 1988, Annie Kennedy was murdered. The police questioned Bryant several times about the murder during the next year; twice he voluntarily gave them blood, saliva, and hair samples. In May, 1989, almost a year after the murder, Bryant was arrested and subsequently tried on charges of first-degree murder, robbery with a firearm, sexual battery with a firearm, and burglary with a firearm.
The testimony at trial established that on the morning of June 3, 1988, Bryant had mowed Kennedy's lawn. Later that day, he returned and she paid him ten dollars, which he used to buy liquor. Annie Kennedy, age sixty-seven, had known Bryant for several years and was friendly to him. Bryant did work for her and, on occasion, ran errands for her. The evidence further *530 reflected that, on the evening of June 3, Bryant got drunk. He was so drunk that, when he stumbled home about 10:30 p.m., he fell into his bed and immediately went to sleep. Sometime during that night he rolled off his bed and onto the floor without waking up. Bryant's mother and a friend picked him up and put him on the bed and, when he rolled off again, they left him on the floor.
The next morning Kennedy's body was discovered lying in the middle of the living room of her house. She had been beaten about the face and sexually battered and money from her welfare check was missing. She had been shot in the chest at close range and had been dead for several hours when she was found. The medical examiner's best estimate was that she had been shot sometime around midnight. Police investigators found Bryant's fingerprints on a cigarette package lying between Kennedy's legs, bloodstains matching Bryant's blood type, and a single hair in Kennedy's pubic area that had the same characteristics as Bryant's hair, although a complete enzyme match was not possible.
Bryant testified in his own defense and denied killing Kennedy. Further, Bryant presented two witnesses who testified that someone else had committed the murder and the other crimes. The jury, however, found Bryant guilty of first-degree murder, sexual battery, burglary, and attempted robbery.
In the penalty phase, Bryant presented ten witnesses, who testified concerning mitigating factors. That evidence established that in June, 1988, Bryant was twenty-five years old. Furthermore, Bryant has an IQ of sixty-six and is considered to be mentally retarded. The testimony also revealed that Bryant had not had a happy childhood, not only because of his retardation but also because he was physically abused by his father. The testimony established that the school system recognized Bryant's emotional problems and placed him in a special program for emotionally handicapped children. Bryant made little progress and, at best, can read at only a second- or third-grade level. The education records reflect that when he was in a controlled environment he behaved well, but on his own he had trouble getting along with other students.
Evidence was also presented showing that when Bryant was sixteen or seventeen, his father deliberately shot him in the arm with a shotgun. Bryant spent a substantial period of time recovering from the wound, which left him without the use of his right arm. Witnesses explained that, since there was not much Bryant could do with both his mental handicap and withered arm, he only got temporary jobs at a sawmill and would do occasional lawn mowing for his mother and neighbors. Testimony was also presented that Bryant used the money he made to purchase drugs and alcohol and, at the time of this incident, he had developed a serious drug and alcohol problem.
At the conclusion of the penalty phase, the jury recommended the imposition of the death penalty. The judge followed that recommendation and imposed the death penalty, finding in aggravation that: (1) Bryant had a prior conviction for aggravated assault;[1] (2) Bryant committed the murder during the course of a sexual battery;[2] (3) the murder was committed to avoid or prevent a lawful arrest or to effectuate an escape from custody;[3] (4) the murder was committed for pecuniary gain;[4] and (5) the murder was especially heinous, atrocious, or cruel.[5] In mitigation, the trial judge found that Bryant had a relatively low intelligence quotient but the judge expressly found that this did not affect Bryant's understanding of what he was doing. Bryant was sentenced to life in prison for the sexual battery and burglary charges and to fifteen years for the attempted robbery charge. These sentences *531 were to be served concurrently but consecutively to the death sentence.
Bryant challenges his convictions and sentence of death on eleven grounds, claiming that the trial court erred in (1) denying his challenge for cause of eleven prospective jurors who said they would automatically recommend the death sentence if they found Bryant guilty of premeditated first-degree murder; (2) excluding the proffered testimony of Mary Harris, thereby denying Bryant the right to present witnesses on his own behalf; (3) denying Bryant's motion for a mistrial; (4) finding as an aggravating factor that Bryant committed the murder for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (5) refusing to instruct the jury that it could find as mitigation that the capital felony was committed while Bryant was under the influence of extreme mental or emotional disturbance; (6) ignoring the wealth of mitigating evidence presented by Bryant; (7) imposing a death sentence which is not proportionately correct under the law of this state; (8) ordering to execute a mentally retarded person in violation of the Eighth Amendment; (9) allowing the state to cross-examine Bryant's mental health expert during the penalty phase regarding Bryant's sanity and then recommending the death sentence based upon this testimony; (10) denying Bryant a fair trial by refusing to read to the jury his requested instruction on circumstantial evidence; and (11) denying Bryant's motion for a new trial at the close of the State's case. On the basis of this record, we find that none of the claims relating to the guilt phase of this trial have any merit under the circumstances of this record and require no discussion. We find there is substantial, competent evidence to support each conviction.
Two of Bryant's claims concerning the penalty phase of this proceeding do have merit and require that we remand this cause for a new sentencing proceeding before a new jury. Specifically, these claims concern (1) the challenges for cause to prospective jurors who would automatically impose the death penalty and (2) the failure of the trial judge to instruct the jury on the statutory mitigating circumstance of extreme mental or emotional disturbance.
Regarding the first claim, Bryant asserts that the trial court erred in failing to excuse for cause jurors who said they would automatically recommend the death sentence if they found Bryant guilty of premeditated first-degree murder. During voir dire, Bryant asked the jurors about their views regarding the death penalty. Bryant noted, with regard to one juror, that he had emphatically indicated that he agreed with the death penalty. The juror explained that there are certain crimes to which he thought the death penalty should be applied. The following colloquy took place:
DEFENSE COUNSEL: What are your feelings in that regard?
JUROR: Well, there is like self-defense or in danger of your life, or something where you might kill someone. But where you've got premeditated murder, the person knows he is going to go out and kill someone, that is my opinion.
DEFENSE COUNSEL: In other words, if you found Robert Bryant guilty of premeditated murder, you would think pretty much automatically that would deserve the death penalty, right?
JUROR: Yes, sir.
Nine prospective jurors then agreed with that juror.
The State, in rehabilitating these jurors, explained that the judge would instruct them that they must take into account certain aggravating and mitigating circumstances. The State explained that the jurors were bound to consider each of those circumstances before voting to impose the death penalty. The jurors appeared to respond affirmatively that they could follow those instructions. Defense counsel, in response, asked a juror:
Let me return to that last question that was asked by Mr. Phelps. Do you remember when I discussed things with Mr. Padgett, and I asked him under what circumstances he felt the death penalty was appropriate, and he said that premeditated murder would be an example *532 where he felt that, I believe he said the death penalty automatically would be the appropriate thing. Is that your feeling still?
JUROR: Right.
Eleven prospective jurors answered the same question in the affirmative.
Bryant challenged these eleven prospective jurors for cause. The trial judge denied the challenge, stating, "I don't think [defense counsel] inquired far enough to explain to them their options under mitigating circumstances, and I don't, so I don't think the motion is well founded." Bryant then exercised six peremptory challenges. As voir dire continued, Bryant used all of his peremptory challenges. Consequently, two of the eleven whom he had challenged for cause sat on the jury. After Bryant had used all of his peremptory challenges, he moved the court for ten additional peremptory challenges. The court granted one additional challenge. In seeking the additional peremptory challenges, Bryant did not use as a ground the denial of his motion to dismiss the specified jurors for cause but sought additional peremptories so the jury would be more racially representative.
In response, the State argues that the trial judge did not abuse his discretion in denying Bryant's challenges for cause to these prospective jurors because the challenges were premature. The State argues that, on the basis of the entire voir dire, the veniremen were able to follow the law. The State further claims that, even if the denial of the initial challenge was error, Bryant would still be entitled to no relief because he was not forced to accept any less than impartial jurors. Finally, the State argues that Bryant did not preserve the issue for appeal at the time he asked for the additional peremptory challenges.
In Singer v. State, reaffirmed by this Court in Hill v. State, 477 So.2d 553 (Fla. 1985), we stated:
[I]f there is basis for any reasonable doubt as to any juror's possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence submitted and the law announced at the trial he should be excused on motion of a party, or by the court on its own motion.
109 So.2d 7, 23-24 (Fla. 1959). The standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment was restated by the United States Supreme Court in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), in which that Court stated:
That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with Witherspoon's [v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)] reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity."
Id. at 424, 105 S.Ct. at 852 (footnote omitted) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)).
We find that this record establishes that Bryant had sufficient grounds to challenge the prospective jurors for cause. We hold that it is not defense counsel's obligation to rehabilitate a juror who has responded to questions in a manner that would sustain a challenge for cause. The appropriate procedure, when the record preliminarily establishes that a juror's views could prevent or substantially impair his or her duties, is for either the prosecutor or the judge to make sure the prospective juror can be an impartial member of the jury. Here, this type of rehabilitation did not occur and, as stated in Singer, there was a basis for a reasonable doubt as to whether these jurors possessed a state of mind which would enable them to render impartial verdicts. Consequently, we find that the error in this instance applies only to the penalty phase and not to the guilt phase of the trial.
Bryant's other claim relates to the trial judge's refusal to instruct the jury that it could find as mitigation "that the *533 capital felony was committed while Bryant was under the influence of extreme mental or emotional disturbance." It is clear from the record that Bryant presented sufficient evidence that he had emotional problems resulting from his retardation and physical disability.
We have previously stated that the "Defendant is entitled to have the jury instructed on the rules of law applicable to this theory of the defense if there is any evidence to support such instructions." Hooper v. State, 476 So.2d 1253, 1256 (Fla. 1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1501, 89 L.Ed.2d 901 (1986) (emphasis added); Smith v. State, 492 So.2d 1063 (Fla. 1986). Regarding mitigating factors dealing with extreme mental or emotional disturbance, we have stated that where a defendant has produced any evidence to support giving instructions on such mitigating factors,[6] the trial judge should read the applicable instructions to the jury. Toole v. State, 479 So.2d 731 (Fla. 1985). It is clear from this record that Bryant presented sufficient evidence in the penalty phase to require the giving of these instructions to the jury.
The other issues presented in the penalty phase are either moot by our disposition of this cause or do not warrant consideration at this time on the basis of this record. Accordingly, we affirm all of Bryant's convictions and his sentences for all offenses except first-degree murder.
For the reasons expressed, we remand this cause for a new sentencing hearing before a new jury and direct that it be held within 120 days from the date this opinion becomes final.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, GRIMES and HARDING, JJ., concur.
BARKETT, J., concurs specially with an opinion, in which KOGAN, J., concurs.
BARKETT, Justice, specially concurring.
I agree with the majority's conclusion as to guilt. However, I do not believe that the death penalty is appropriate for this defendant. The death penalty is supposedly reserved for the most heinous of crimes and the most culpable of murderers. See, e.g., Songer v. State, 544 So.2d 1010, 1011 (Fla. 1989); Fitzpatrick v. State, 527 So.2d 809, 811 (Fla. 1988); State v. Dixon, 283 So.2d 1, 7 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Despite the crime committed in this case, Robert Bryant, Jr., does not fit this category.
At the time Bryant committed this senseless murder, he was a twenty-five-year-old unemployed, emotionally disturbed, and mentally retarded adult who could not read or write, who was addicted to crack cocaine, and who was raised in poverty by an abusive father who had deliberately shot Bryant while in high school with a doublebarreled shotgun causing him to lose total use of his subsequently withered right arm.
Ten witnesses testified on Bryant's behalf at the penalty phase hearing. Rachael Spanger, the director of exceptional student education for the Taylor County school district, who had known Bryant since he was in seventh grade, explained that Bryant suffered from impaired judgment and was unable to control his own behavior, mostly as a result of being raised in a family environment involving child abuse, spouse abuse, and alcoholism. Ms. Spanger further explained that Bryant had been making progress in a program for emotionally handicapped students until the time he was shot by his drunken father. Bryant eventually dropped out of high school after repeating the ninth grade for the third time.
Eloise Gardner, Bryant's high school guidance counselor, testified that she had *534 called HRS to report a case of suspected child abuse based on what Bryant had told her regarding his father's drinking problem and threats to him and his mother. Sadly, it was sometime after that call that Bryant was shot.
The last witness called was Dr. James Mendelson, a clinical psychologist appointed by the court to evaluate Bryant. Dr. Mendelson confirmed the negative effects of a poverty-stricken and abusive childhood on Bryant's psychological and emotional development. Mendelson testified that his impression of Bryant, one that was reinforced by the testimony he heard from other defense witnesses, was that Bryant was not an aggressive person and was not chronically angry or hostile notwithstanding the crime with which he was accused. When asked to put all the factors together, including the fact that Bryant was mentally retarded and was probably abusing alcohol and crack cocaine at the time of the offense, Mendelson testified that in his opinion, Bryant would have had "very great difficulty in conforming his behavior to the requirements of the law."
In reviewing death sentences, our job is to compare the circumstances of this case with other cases involving similar situations to determine whether the death penalty is appropriate. E.g., Proffitt v. State, 510 So.2d 896, 897 (Fla. 1987); Menendez v. State, 419 So.2d 312, 315 (Fla. 1982). In considering Bryant's severe mental and emotional problems, drug addiction, and troubled childhood, and comparing this case to others involving similar situations, I cannot conclude that his degree of culpability is such that he merits the death penalty. Cf. Smalley v. State, 546 So.2d 720 (Fla. 1989); Livingston v. State, 565 So.2d 1288 (Fla. 1988); Fitzpatrick v. State, 527 So.2d 809 (Fla. 1988). Consequently, rather than remanding for a new penalty phase proceeding, I would sentence Bryant now to life imprisonment without the possibility of parole.
KOGAN, J., concurs.
NOTES
[1] § 921.141(5)(b), Fla. Stat. (1989).
[2] § 921.141(5)(d), Fla. Stat. (1989).
[3] § 921.141(5)(e), Fla. Stat. (1989).
[4] § 921.141(5)(f), Fla. Stat. (1989).
[5] § 921.141(5)(h), Fla. Stat. (1989).
[6] For example, the instant case involves section 921.141(6)(b), Florida Statutes (1989) (capital felony committed while defendant under influence of extreme mental or emotional disturbance), and section 921.141(6)(f), Florida Statutes (1989) (defendant's capacity to appreciate criminality of his conduct or to conform his conduct to requirements of law was substantially impaired).