860 So.2d 930 (2003)
Rory Enrique CONDE, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-789.
Supreme Court of Florida.
September 4, 2003.
Rehearing Denied November 5, 2003.
*937 Benjamin S. Waxman of Robbins, Tunkey, Ross, Amsel, Raben, Waxman & Eiglarsh, P.A., Specially Appointed Public Defender, Miami, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Debra Rescigno, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Rory Enrique Conde appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm both the conviction and death sentence.

FACTS
On January 13, 1995, Conde picked up Rhonda Dunn, a prostitute, and took her to his apartment. After twice engaging in sexual relations, Dunn lay on the bed with Conde for approximately five minutes and then got up to enter the bathroom. Conde followed her from behind and began to manually strangle her. A struggle ensued, in which Dunn suffered numerous defensive wounds and fell to the floor with Conde on top, continuing to strangle her. Dunn eventually died from asphyxiation. Conde then disposed of her body by driving it to another location and leaving it on the side of the road.
This sequence of events had occurred on five prior dates. On each occasion, Conde picked up a prostitute, they engaged in sexual relations at his apartment, and Conde then strangled the victim to death, later depositing the body along the side of a road.[1] This series of murders occurred over the course of six months and was preceded by the break-up of Conde's marriage, which occurred when his wife discovered that Conde was using the services of prostitutes. Conde later confessed to all six murders and stated that after each murder, he knelt over the deceased body and verbally blamed the victim for his marital problems.
Conde was arrested in June of 1995, after fire rescue personnel discovered a woman, naked and bound in duct tape, trapped in his apartment. During the investigation of that crime, evidence was discovered in Conde's apartment that linked him to the series of murders. Upon his arrest, Conde was read his Miranda rights, consented to searches of his apartment and automobile, and consented to the taking of saliva and blood samples. He was interrogated over the course of the afternoon and evening of his arrest date but did not admit to the crimes. The next day, he was allowed to telephone his family, after which he confessed to each murder. He was charged by a six-count indictment with the first-degree murder of all six victims. The counts were severed, and his first trial, held in October 1999, was for Dunn's murder. The trial court permitted the State to introduce Williams[2] rule evidence of the other five murders. On the basis of DNA, fiber, tire, and shoe evidence, together with medical testimony and Conde's confession, the jury found Conde guilty of first-degree murder.
In the penalty phase, the State alleged the existence of three aggravators: (1) Conde was previously convicted of a felony *938 involving the use or threat of violence; (2) the murder was especially heinous, atrocious, or cruel (HAC); and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). Conde proffered the following statutory mitigating circumstances: (1) he had no significant history of prior criminal conduct; (2) the murder was committed while under the influence of extreme mental or emotional disturbance; and (3) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. He presented three mental health experts. Conde also presented evidence of nonstatutory mitigation, primarily relating to his marital difficulties and family background, including physical, emotional, and sexual abuse, through the testimony of several family members and friends.
The jury recommended the death penalty by a nine-to-three vote. Following a Spencer hearing,[3] the trial court imposed a sentence of death, finding the three requested statutory aggravating circumstances (HAC, CCP, and prior violent felony), one statutory mitigating circumstance (no significant history of prior criminal activity, given moderate weight), and five nonstatutory mitigating circumstances (positive influence on family despite adversity, given moderate weight; good employment background, given moderate weight; relationship with his children, given moderate weight; mental and emotional problems, given little weight; and status as model inmate, given little weight). This appeal followed.
Conde now raises thirteen issues in his direct appeal to this Court, seven involving the guilt phase[4] and six involving the penalty phase.[5] However, because many of those issues consist of distinct subissues, we address here a total of seventeen claims, beginning with the guilt phase.

GUILT PHASE

Denial of Cause Challenges to Prospective Jurors
In his first claim, Conde asserts that the trial court erred in denying cause challenges to six prospective jurors, thus forcing him to use peremptory challenges to strike five of those six and to forgo using the same peremptory challenges to strike *939 the sixth and others who served on the jury. He alleges that voir dire questioning revealed significant doubt as to the ability of each challenged juror to set aside any bias regarding the death penalty and impartially render a penalty-phase recommendation. In response, the State asserts that each challenged prospective juror demonstrated impartiality and the ability to render a recommendation based upon the evidence presented.
A trial court has great discretion when deciding whether to grant or deny a challenge for cause based on juror competency. Barnhill v. State, 834 So.2d 836, 844 (Fla.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 2281, 156 L.Ed.2d 134 (2003). This is because trial courts have a unique vantage point in their observation of jurors' voir dire responses. Therefore, this Court gives deference to a trial court's determination of a prospective juror's qualifications and will not overturn that determination absent manifest error. Hertz v. State, 803 So.2d 629, 638 (Fla. 2001), cert. denied, 536 U.S. 963, 122 S.Ct. 2673, 153 L.Ed.2d 846 (2002). Where a prospective juror is challenged for cause on the basis of his or her views on capital punishment, the standard that a trial court must apply in determining juror competency is whether those views would prevent or substantially impair the performance of a juror's duties in accordance with the court's instructions and the juror's oath. Id. (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). "In a death penalty case, a juror is only unqualified based on his or her views on capital punishment, if he or she expresses an unyielding conviction and rigidity toward the death penalty." Barnhill, 834 So.2d at 844.
The first challenged venireman we address here is prospective juror Groom. During voir dire questioning, Groom initially stated that he felt the death penalty should be mandatory in some circumstances, but upon further questioning, he stated that he could follow the court's instructions to weigh aggravating and mitigating circumstances in deciding what sentence to recommend. Groom's answers as a whole do not present an unyielding conviction and rigidity toward the death penalty. Rather, his answers indicate that he felt his penaltyphase recommendation would depend upon the facts presented to him and the court's instructions. Where, as here, a prospective juror initially states that one who murders should be executed but later states that he can follow the law upon court instruction, the trial court does not abuse its discretion in denying a cause challenge. Barnhill, 834 So.2d at 845. We therefore do not find manifest error with regard to this juror.[6]
The second challenged prospective juror, Loida Hernandez, was repeatedly questioned by defense counsel as to whether she would automatically recommend the *940 death penalty if Conde were found guilty. To each question, Hernandez answered consistently that she would need to evaluate the evidence as presented. It is therefore clear that Hernandez's answers did not present an unyielding conviction and rigidity toward the death penalty but, rather, suggested that she would go into both phases of trial with an open mind.
The third challenged venireman was prospective juror Huey, who responded appropriately to initial questioning by the trial judge and prosecutor about his ability to wait until the second phase of trial and listen to evidence of aggravating and mitigating circumstances before reaching his final recommendation. Thereafter, the following defense inquiry took place:
[Defense Counsel]: You put down on your questionnaire that you believe regarding the death penalty ... that murderers give up their right to live.... Explain what you mean by that.
[Huey]: Well, anyone that would be found guilty of taking someone else's life I think gives up their right to live. I believe an eye for an eye.
[Defense Counsel]: Now, let's assume... you come to believe beyond any reasonable doubt that Mr. Conde is guilty of having killed Rhonda Dunn ... with premeditation, which is first degree murder. In your mind, would that mean that he should receive the death penalty?
[Huey]: ... I believe that I can decide based on the aggravating or mitigating circumstances whether life imprisonment or the death penalty should be the appropriate choice.
....
[Defense Counsel]: Now, the Court read a statement to the jurors in which he said that Mr. Conde was arrested for the homicide of six people.... Would you believe that once you hear that information that your belief regarding the forfeiture of a life would be even stronger?
....
[Huey]: I would certainly consider that an aggravating circumstance.
[Defense Counsel]: Would there be any way for you to be able to disregard that?
[Huey]: No.
At that point, the prosecution objected, and the trial court instructed Huey that the other five homicides would not be presented as evidence of aggravation and that the jury would be instructed not to consider such as an aggravating circumstance. Conde's counsel was then allowed to ask the question again, to which Huey responded that it "would be hard" to disregard the evidence of the other five homicides. Finally, Huey was asked whether his belief in "an eye for an eye" would interfere with his ability to sit as a juror and engage in the weighing process, to which he responded, "No, it would not." Huey's answers regarding his willingness to consider aggravating and mitigating circumstances sufficiently indicated that he was prepared to perform his duties as a juror and undertake the weighing process at the end of the penalty phase. After receiving further instruction from the judge, Huey answered honestly that it would be difficult for him to disregard the existence of five other murders in sentencing Conde, but Huey also firmly stated that his personal belief in "an eye for an eye" would not impair his ability to perform his duties as a juror. We do not find that the trial court abused its discretion or that there was manifest error with regard to this juror.
The fourth challenged venireman was prospective juror Owens. Defense counsel asked her only two questions regarding *941 the death penalty, to which she answered that if it were proven beyond a reasonable doubt that a person committed first-degree murder, she would automatically be in favor of the death penalty. Thereafter, Owens was excused from the courtroom, and defense counsel moved to strike for cause. However, on the basis of Bryant v. State, 601 So.2d 529 (Fla.1992), the prosecutor urged that the appropriate procedure where a prospective juror expresses an opinion which indicates a substantial inability to properly perform a juror's duties is for either the trial judge or the prosecutor to make sure the prospective juror can be an impartial member of the jury. The trial court called Owens back into the courtroom, and following further inquiry, Owens stated that she would wait and listen to all the mitigating and aggravating factors before agreeing to the death penalty. On the basis of Bryant, the trial court correctly engaged in this additional questioning of the juror. See id. at 532; Reaves v. State, 639 So.2d 1, 4 (Fla.1994). We do not find manifest error with regard to Owens.
The fifth challenged venireman, prospective juror Rolle, told the trial court that she believed the use of the death penalty was appropriate in cases of "cold blooded murder" but said she could wait to make an appropriate recommendation until after the evidence was presented. However, in questioning by defense counsel, Rolle persisted in her view that she could not recommend anything but the death penalty if the State proved Conde had killed six people. The final colloquy between Rolle and defense counsel went as follows:
[Defense Counsel]: Would it matter whether he even had a reason? Would it matter to you?
[Rolle]: It still would matter, but it depends. If it was self defense or his life was on the line or something like that, I would say maybe life.
[Defense Counsel]: ... [O]ther than self defense, once you have found him guilty, again are you saying that that means that the ball game is over? It doesn't matter what personal reason he had? It doesn't matter what kind of childhood he had, none of those things matter? It is just if he killed those people, that is it?
[Defense Counsel]: Is that what you are saying?
[Rolle]: Yes. Because I would want to know why would he kill these people? What did they do to him? And if he just, you know, without a reason, just hate women or, whatever, that is my answer, yes.
Defense counsel then moved to strike Rolle. In response, the prosecutor argued that mitigation is "the reason behind" a crime, and therefore Rolle appeared willing to consider mitigating circumstances. The trial court denied the motion for cause without further questioning of Rolle. As noted above, where a prospective juror's answers suggest incompetency to be a juror, rehabilitation by the prosecutor or judge is the proper next step. Reaves, 639 So.2d at 4. Here, however, the trial judge denied defense counsel's motion to strike for cause without clarifying on the record whether mitigation was actually "a reason" that Rolle could weigh in accord with the court's instructions. However, we find any error with regard to this prospective juror to be harmless. Where an appellant claims he was wrongfully forced to exhaust his peremptory challenges because the trial court erroneously denied a cause challenge, both error and prejudice must be established. In order to establish prejudice, an appellant "must identify a specific juror whom he otherwise would have struck peremptorily." Trotter v. State, 576 *942 So.2d 691, 693 (Fla.1990). Here, Conde has identified a specific juror, Fuentes, whom he would have struck if he had not expended his peremptory challenges. However, where a trial court has awarded additional peremptory challenges to a defendant, each such additional challenge is treated as having replaced one that was expended on a juror who should have been but was not struck for cause. See Overton v. State, 801 So.2d 877, 889 (Fla.2001); Cook v. State, 542 So.2d 964, 969 (Fla. 1989). Here, the trial court awarded Conde two peremptory challenges in addition to those normally allotted. Thus, in order to show reversible error, Conde needed to present error in the denial of cause challenges as to three prospective jurors. We do not find that error. Accordingly, we find the trial court's denial of the cause challenge against Rolle to be harmless error.[7]
The final challenged prospective juror was Fuentes, who was selected to serve on the jury after the defense used all available peremptory challenges, including two additional challenges awarded by the trial court. In response to defense questioning, Fuentes said that he believed the death penalty would be appropriate in the majority of first-degree murder cases. Thereafter, the trial judge further questioned Fuentes. In that colloquy, Fuentes stated he would listen to the mitigating and aggravating evidence, and if the mitigating evidence outweighed the aggravating evidence, he could recommend a life sentence. Under Reaves, the trial judge's questioning of Fuentes was the appropriate procedure to be followed. As noted in Johnson v. State, 660 So.2d 637, 644 (Fla. 1995), it is not unusual for counsel to elicit strong responses that prospective jurors would genuinely reconsider once they were instructed on their legal duties. Here, Fuentes gave a strong response to defense questioning. However, the final colloquy between the trial judge and Fuentes provides support for the conclusion that his views would not prevent or substantially impair the performance of his duties as a juror and that he would be willing to follow the court's instructions and the juror's oath. We do not find manifest error with regard to this juror.
In conclusion, we find that manifest error has not been shown with regard to the trial court's denial of cause challenges to prospective jurors Groom, Hernandez, Huey, Owens, and Fuentes. As for prospective juror Rolle, although there should have been further questioning, prejudice has not been shown.

Grant of Cause Challenge to Prospective Juror Aguirregaviria
In his second claim, Conde alleges the trial court erred in granting the State's motion to strike for cause prospective juror Aguirregaviria on the basis of her views about capital punishment. After hearing arguments by both sides, the trial court granted the motion, stating: "This juror has expressed some reasonable doubt about her ability to serve in a death penalty case just by her equivocal responses. It is clear that it is not just deep concern, it is deep doubt that the Court registered from her responses." Indeed, Aguirregaviria herself stated that she did not support the death penalty and repeatedly expressed significant doubt as to whether she would ever be able to recommend the death penalty, stating that she might consider the death penalty only after defense counsel provided extreme examples, such as the torture and mutilation *943 of a small child. Based upon the consistently equivocal voir dire answers given by this juror, we do not find the court erred in striking her for cause. See Morrison v. State, 818 So.2d 432, 442 (Fla.), cert. denied, 537 U.S. 957, 123 S.Ct. 406, 154 L.Ed.2d 308 (2002); Fernandez v. State, 730 So.2d 277, 281 (Fla.1999); Foster v. State, 679 So.2d 747, 752 (Fla.1996).

Motion for Judgment of Acquittal
In his third claim, Conde asserts error in the trial court's denial of his motion for judgment of acquittal, arguing that the State's evidence of premeditation was entirely circumstantial and was not inconsistent with every other reasonable inference. The State responds that its evidence of premeditation was not wholly circumstantial and that Conde's own confession and the overwhelming circumstantial evidence, including the reasonable inferences to be drawn from the five prior murders, provided a sufficient basis on which the jury could conclude that Conde's murder of Dunn was premeditated.
On appeal of a denial of a motion for judgment of acquittal where the State submitted direct evidence, the trial court's determination will be affirmed if the record contains competent and substantial evidence in support of the ruling. LaMarca v. State, 785 So.2d 1209, 1215 (Fla.2001). Because the State presented direct evidence in the form of Conde's confession, this Court need not apply the special standard of review applicable to circumstantial evidence cases. See Pagan v. State, 830 So.2d 792, 803-04 (Fla.2002). Premeditation is defined as a "fully formed conscious purpose to kill," which "may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act." Woods v. State, 733 So.2d 980, 985 (Fla.1999) (quoting Wilson v. State, 493 So.2d 1019, 1021 (Fla.1986)). Conde's confession detailed the events of the night Dunn was murdered. Those details, including that he spent considerable time with Dunn before attacking her and that she struggled during the attack, indicate that Conde had the time to reflect upon his actions but nonetheless continued to take the steps necessary to murder Dunn. Conde's confession together with medical testimony regarding Dunn's numerous defensive wounds, testimony indicating it takes approximately three minutes to strangle someone to death, and other evidence establishing a definite pattern of similar crimes, provide competent, substantial evidence that Conde had the time to reflect upon his actions and premeditated Dunn's murder. Accordingly, we find no error in the trial court's denial of Conde's motion for judgment of acquittal.

Williams Rule Evidence of Five Prior Homicides
In his fourth claim, Conde argues that the trial court erred by admitting Williams rule evidence of the other five homicides committed prior to the charged crime. The separate counts for each homicide were severed for trial on Conde's own motion in July 1995. Thereafter, pursuant to section 90.404(2)(b)(1), Florida Statutes (1995), the State gave notice in the Dunn trial of its intent to rely upon "other act" evidence of the other five murders. In response, Conde filed a motion for an order in limine, asking the trial court to exclude evidence of the collateral murders. The trial court held two hearings on Conde's motion. In the first, the court informed the State that it would need to proffer the evidence regarding the collateral crimes it wished to present so that the court could determine boundaries to its *944 admittance. The State thereafter filed a response specifying the proffered evidence and listing the similarities between the crimes, including (1) that each victim was a prostitute who worked within a limited area and was killed by strangulation late at night; (2) each body was found within a small radius of Conde's home, re-dressed and face down in a seemingly posed position; (3) the lividity patterns of each body indicated it had been initially on its back and then turned face down; (4) matching fiber, tire, DNA, and semen evidence was found on many of the bodies; and (5) the word "third" was written on the third victim, indicating the serial nature of the crimes. At the second hearing, the trial court repeated its concern regarding management of the quantity of collateral crimes evidence, if admitted.
At both hearings, Conde argued that the collateral crimes evidence possessed no tendency to prove or disprove a material fact and would have an overwhelmingly prejudicial impact on the jury. The State, however, argued that the evidence was relevant to proving identity, intent, and premeditation, as well as to disproving any potential argument by Conde, in the absence of evidence of the other crimes, that Dunn's murder was the result of an accident or the product of the heat of passion. In response to the court's concerns, the State emphasized its intention to minimize the collateral crimes evidence by avoiding the presentation of numerous crime scene technicians, photographs, and evidentiary matters such as the chain of custody. To that end, the prosecutor suggested that, as opposed to calling every technician and medical examiner involved in the six separate homicides, he would call a single witness for each of the evidentiary areas involved (fiber, tire track, and DNA analysis) and a single medical examiner, all of whom could summarize and testify to the most important links between the crimes. The prosecutor also suggested that the emphasis on the collateral crimes could be reduced by defense stipulation to certain preliminary issues such as the chain of custody. After each side presented its arguments, the trial court concluded that it would admit the collateral crimes evidence and specifically noted that it would "take certain steps to make sure that this presentation of evidence does not become the feature of this trial."[8]
Conde now argues on appeal to this Court that the trial court erred because the State's need for the Williams rule evidence was nominal and cumulative of other evidence bearing on predominantly undisputed issues. He notes that this Court previously has reversed convictions where, although collateral crimes evidence was admissible, the details admitted were excessive and unjustified. Conde urges that the collateral crimes evidence presented at his trial was excessive, necessitating reversal due to its prejudicial effect. In response, the State argues that the admission of the Williams rule evidence was proper because the fact that Conde killed *945 five prostitutes before Dunn in the same manner went to proving identity, premeditation, intent to kill, and absence of mistake. Specifically, the State notes links between the murders that show a calculated pattern: the victims were all prostitutes who were picked up in the same part of town; they were taken to the same apartment and murdered by manual strangulation after first engaging in sexual relations with Conde; and they were re-dressed and disposed of face-down in roadside grassy swales. As for the quantity of the Williams rule evidence that was admitted, the State argues that the evidence did not impermissibly become a feature of the trial because "[m]ore is required for reversal than a showing that the evidence is voluminous." Snowden v. State, 537 So.2d 1383, 1385 (Fla. 3d DCA 1989). The issue, the State urges, is whether the evidence became a focal point of the trial, and the Williams rule evidence in this case was limited to evidence necessary to prove that Conde committed the other five murders, which was relevant to material issues in the Dunn murder trial.
"Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of ... intent, ... plan, ... identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity." § 90.404(2)(a), Fla. Stat (2002). Such evidence is called Williams rule evidence in reference to this Court's decision in Williams v. State, 110 So.2d 654 (Fla. 1959). "The test of admissibility [of Williams rule evidence] is relevancy. The test of inadmissibility is a lack of relevancy." Id. at 660. However, a trial court may not allow relevant collateral crimes to become a feature of the trial, which occurs when inquiry into the collateral crimes "transcend[s] the bounds of relevancy to the charge being tried" and the prosecution "devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant." Williams v. State, 117 So.2d 473, 475 (Fla.1960). Based upon these legal principles, we find that the court below did not abuse its discretion in admitting the Williams rule evidence presented at Conde's trial.
As the first step of our analysis, we conclude that the collateral crimes evidence established the fact that Conde had committed substantially similar crimes on five prior occasions, which in turn was relevant to numerous material issues, such as identity, intent, and premeditation. See, e.g., Bradley v. State, 787 So.2d 732, 741-42 (Fla.2001) (Williams rule evidence of prior crime relevant to proving intent and premeditation); Townsend v. State, 420 So.2d 615 (Fla. 4th DCA 1982) (admission of Williams rule evidence upheld where defendant was on trial for strangulation of two prostitutes and State introduced six other murders as relevant to identity and motive). Although Conde argues that identity and intent were largely uncontested issues, we note that premeditation, defined as a "fully formed conscious purpose to kill," was the single most contested issue at trial and that the pattern of these crimes, together with the message Conde wrote on the back of his third victim indicating that she was the "third" and "[see] if you can catch me," was evidence of premeditated intent to kill. This evidence was clearly relevant given Conde's theory of defense that he killed in an "instantaneous combustion" of unexpected and unplanned emotions. See Wuornos v. State, 644 So.2d 1000, 1006 (Fla.1994) (finding evidence of six prior murders relevant to premeditation where accused's testimony portrayed her as the actual victim). *946 Additionally, we note that even if lack of premeditation was the primary focus of Conde's defense, the State also had the burden of proving the material issues of identity and intent. Therefore, any evidence tending to prove those issues was relevant.[9]
In the second step of our analysis, we conclude that the Williams rule evidence admitted below did not become an impermissible feature of the trial and that the trial court did not abuse its discretion in allowing the evidence ultimately introduced by the State. While Conde primarily complains of the volume of the evidence admitted, we note that it is not solely the quantity but also the quality and nature of collateral crimes evidence in relation to the issues to be proven that determines whether its admission has "transcended the bounds of relevancy to the charge being tried." Indeed, this Court repeatedly has affirmed the admission of extensive collateral crimes evidence where that evidence was wholly probative of material issues. See Zack v. State, 753 So.2d 9, 16-17 (Fla.2000) (probative value of extensive evidence of thefts, sexual assault, and murder over a two-week period prior to charged crime outweighed prejudicial effect; distinguishing Steverson v. State, 695 So.2d 687 (Fla. 1997), in which evidence was inadmissible because it lacked relevance rather than because it was extensive); Wuornos, 644 So.2d at 1004-06 (introduction of extensive evidence of six prior murders did not amount to "needless overkill"); Ashley v. State, 265 So.2d 685, 692-94 (Fla.1972) (no error in admission of bullet evidence, autopsies, confession, and other witness testimony regarding collateral crimes). Conde points out that this Court has also found reversible error in the admission of extensive collateral crimes evidence in other cases. But reversal in those cases was predicated on this Court's conclusion that the evidence, or severable parts thereof, ultimately lacked relevance. See Steverson, 695 So.2d at 690-91 (regarding collateral crime evidence that defendant shot police officer while resisting arrest four days after charged crime, that reference to shooting provided context and proved consciousness of guilt but "blowby-blow" recounting of officer's injuries and recovery was irrelevant); Henry v. State, 574 So.2d 73, 74-5 (Fla.1991) (where evidence of subsequent murder of stepson was admitted in trial for ex-wife's murder, some reference to boy's murder may have been necessary to place events in context, but detailed evidence of search for and discovery of body, defendant's confession to stabbing child, and color photograph of stab wounds was unwarranted and irrelevant to motive, intent, or identity).
In the instant case, Conde points to the first three days of trial as excessive introduction of collateral crimes evidence. However, the length of this testimony was unavoidable given the fact that five collateral *947 crimes were involved. See Snowden, 537 So.2d at 1385 ("More is required for reversal than a showing that the evidence is voluminous."); Townsend, 420 So.2d at 617 (number of transcript pages and exhibits related to collateral crimes evidence is not sole test when such quantity is result of there being numerous similar crimes). Additionally, the record reflects that the State limited its evidence regarding the five prior murders: a single medical examiner was called to summarize from the records of numerous other examiners the cause-of-death evidence for all five murders; only one serologist, one DNA criminologist, and one trace-evidence specialist gave summary testimony regarding the DNA and fiber evidence linking the collateral crimes; and the State rapidly introduced collateral crime-scene testimony from eight detectives, including cross-examination, over the course of only six hours. As for photographs, the State introduced approximately five for each collateral murder, each of which had a specific purpose of establishing the similarity between the crimes.[10] Given the trial court's vigilance in its duty to ensure that the collateral crimes evidence did not become a feature of the trial, we find that no abuse of discretion occurred in the admission of this evidence. In so concluding, we place special emphasis on the fact that the trial court repeatedly instructed the jury as to the proper purpose of this Williams rule evidence each time it was introduced.

Admission of Testimony Regarding G.M.
The first of three subparts to Conde's fifth claim involves the admission of testimony regarding a woman, referred to as G.M., who was discovered imprisoned in Conde's apartment in June 1995. That incident led police to investigate Conde as a suspect in the series of murders. During pretrial, the State proffered the G.M. evidence as inextricably intertwined with the crime charged and stated its intent to limit testimony to the following facts: (1) a call from neighbors regarding a strange noise from Conde's apartment summoned fire rescuers, who broke in and found G.M. wrapped in duct tape; (2) rescuers removed the tape, and G.M. identified herself as a prostitute and Conde as her attacker; (3) thereafter, DNA evidence from the G.M. investigation was matched to DNA evidence from the serial murder investigation, and search warrants for Conde's apartment were obtained. Conde objected to the proffered evidence, arguing that it was a collateral crime inadmissible under section 90.404(b), Florida Statutes, and lacking in the necessary relevancy to the context of the charged crime to justify admission as "inextricably intertwined." The trial court concluded that it would allow the evidence, but limited it, instructing:
You will be able to introduce information about a call from the neighbors. Fire rescue appeared. They broke in. They found a woman whom they removed the tape from. That there was an identification of this defendant from a photograph. And then you spring forward into what the police did as far as the investigation. There will be no other information about her being a prostitute, about DNA linkage, whatever may have been with her.... That identification alone gives you enough to paint a picture of why the police went forward.
At trial, a fire rescue employee testified as to this sequence of events, and Conde renewed his objection.
*948 In this appeal, Conde asserts that the trial court abused its discretion and committed reversible error by admitting this evidence of his collateral crime, arguing that any marginal probative value was outweighed by substantial unfair prejudice. He asserts that the circumstances of his arrest could have been explained by police witnesses through general terms of "leads" and a "follow-up" visit to Conde's apartment. The State, on the other hand, argues that the G.M. evidence was properly admitted as "inextricably intertwined" with the crime charged because it was necessary to complete the story of the crime by presenting an orderly and intelligible case. The State urges that its limited account of the G.M. incident was necessary to describe the investigation leading to Conde's arrest and subsequent confession, which was admitted at trial.
We find that the trial court did not abuse its discretion in admitting the limited account of the G.M. incident in order to, as the trial court stated, "allow the jury to understand the full sequence of events." In Consalvo v. State, 697 So.2d 805 (Fla.1996), evidence of a collateral burglary committed approximately six days after the charged offense was admissible "to establish the entire context out of which the criminal action occurred." Id. at 813. Specifically, we noted that the police discovered evidence of the charged offense on Consalvo's person at the time of his arrest for the collateral crime and overheard Consalvo place a phone call while in custody for the collateral crime that incriminated him in the charged offense. Id. Similarly, in Long v. State, 610 So.2d 1276 (Fla.1992), evidence regarding a collateral crime but not the details of that crime was admissible where the defendant's arrest for that crime and the subsequent examination of his vehicle supplied hair and fiber samples connecting him to the charged crime. Id. at 1281; see also Henry v. State, 574 So.2d 73, 75 (Fla. 1991) (some reference to, but not the full details of, a subsequent crime "may have been necessary to place the events in context, to describe adequately the investigation"). Here, as in Consalvo, Long, and Henry, the G.M. incident was relevant to explain the context in which evidence connecting Conde to the murders was discovered. The G.M. incident led to Conde becoming a suspect, his arrest, the interrogation, and the giving of his consent to searches of his apartment and car, which in turn led to his confession and produced other vital evidence, such as prior victim Charity Nava's missing green beeper, Dunn's blood on a baseboard in Conde's bedroom, fibers from his carpeting that matched those on the victims, and the tire tread from his car tires that matched tire prints near the victims' bodies. We note that while evidence, such as the G.M. incident, that is inextricably intertwined with the charged crime is admissible to establish the entire context of the crime, care should be taken to exclude unnecessary details. There is, of course, no bright line between the admissible and inadmissible facts of inextricably intertwined collateral crimes. The drawing of that line is within the discretion of the trial court. Here, the trial court limited testimony regarding the G.M. incident to a quick recital of the basic facts. We therefore conclude that the trial court did not abuse its discretion.

Admission of Testimony Regarding Officer's Warning to Dunn
The second of three subparts to Conde's fifth claim involves the admission of testimony by a detective that the detective had warned the victim about the series of murders. When this detective was called to testify, the defense objected and questioned the relevance of the detective's testimony. The State proffered that the *949 testimony would reveal the detective's warnings to Dunn, which were relevant to her state of mind, i.e., awareness of the danger and, in turn, to the identification of Conde, a soft-spoken and unthreatening person, as the murderer. The trial court allowed the testimony, and the detective testified that he had warned Dunn on approximately three occasions about the series of murders, advising her to stay near the other women in her area. The detective further testified that he saw Dunn working by herself about thirty-six hours before her body was found and again advised her to try to work with other women. According to the detective, Dunn's reply to these warnings was always to simply laugh and smile.
As presented to the trial court, the prosecution's argument regarding the relevancy of this testimony was that, if Dunn was aware of the series of murders in her area, it seems more likely than not that her killer was someone exhibiting a calm, nonthreatening manner, given her voluntary departure with him. We agree with Conde that this evidence had marginal relevance. However, we do not find that the trial court abused its discretion in finding that the evidence had some relevance to the issue of identity. Moreover, any error in the admission of this evidence would be harmless beyond a reasonable doubt.

Admission of Testimony Regarding Flight at the Time of Arrest
The third of the three subparts to Conde's fifth claim involves Conde's alleged attempt to flee at the time of his arrest. In opening statements, the prosecution stated that upon entering Conde's grandmother's home in June 1995, detectives saw the defendant crouching down in an apparent attempt to get under a bed. The defense objected on the basis that any consciousness of guilt suggested by this act was just as easily associated with the G.M. incident, which had occurred within that week, as with the murders, which had occurred over six months before. The court overruled Conde's objection. During the evidentiary portion of the trial, when the prosecution began to ask a detective about the arrest, Conde "renew[ed his] previous motion and objection reference to that line of questioning." This objection was overruled without discussion, and the detective eventually testified that he saw Conde "on the right side of a large sized bed and he was kneeling, making his way, it appeared to me that he was going to conceal himself under the bed." In closing argument, the prosecutor argued that this was the behavior of someone who knew he was caught for his crimes. On appeal, Conde asserts that the trial court's admission of this testimony was error, as his arrest came six months after the last murder and was probative, at most, of consciousness of guilt concerning the then recently-committed, uncharged crime against G.M.
The State erroneously argues that this issue was unpreserved and, thus, is subject to fundamental error analysis. However, as noted above, Conde objected twice to the testimony. We agree with Conde that insufficient evidence existed to establish a nexus between his conduct and the charged crime, given the length of time since Dunn's murder, the recent crime against G.M., and the absence of evidence that Conde even was aware that he was the subject of a murder investigation. See Escobar v. State, 699 So.2d 988, 996 (Fla. 1997) (insufficient evidentiary nexus for admission of flight evidence where defendant attempted to avoid arrest after traffic violation in another state, twenty-seven days after commission of charged offense). However, although we conclude that the *950 trial court abused its discretion in admitting this evidence without the necessary nexus, we also find that this error was harmless beyond a reasonable doubt under the standard set forth in State v. DiGuilio, 491 So.2d 1129 (Fla.1986).

Prosecutorial Comments During Opening and Closing Arguments
In his sixth claim, Conde asserts that the trial court erred in failing to limit certain prosecutorial comments made in opening and closing arguments that compromised Conde's right to a fair trial by improperly conditioning the jury to view him as a serial murderer. Because the control of prosecutorial comments to the jury is within the trial court's discretion, we review this issue under an abuse of discretion standard. Esty v. State, 642 So.2d 1074, 1079 (Fla.1994).
With the exception of a single objection to the State's use of the term "the Tamiami strangler," Conde did not object to the prosecutorial comments that he now challenges. Thus, fundamental error review applies with regard to those comments. The overall theme of the prosecutor's arguments was that Conde strangled Dunn in the same manner as he had the other five victims. The prosecutor did not argue to the jury that they should convict on the basis of Conde's status as a serial killer but, rather, specifically told the jury in closing argument that evidence of the collateral murders was admitted for the limited purpose of proving a premeditated plan.[11] This is permissible argument on the basis of Williams rule evidence, and thus, we do not find error, let alone fundamental error. As for the remaining comments on matters other than the collateral murders, we similarly find no fundamental error.[12] Lastly, regarding the State's use of the terms "the strangler" and "the Tamiami strangler," the record reflects that Conde objected once to the use of the term "the Tamiami strangler" and did so after three prior "strangler" references. It appears from the record that the specific statement objected to, that "each and every one of the victims of the Tamiami strangler were found to have [certain identical] fibers on them," was a general reference to the perpetrator of these multiple crimes and concerned the police investigation of the six murders. In view of this isolated usage, we do not find that the trial court abused its discretion in denying Conde's objection to this statement. We also find any error in denying the objection to be harmless beyond a reasonable doubt.

Motion to Suppress Confession
In his seventh claim, Conde relies upon three grounds for asserting that the trial court erred in failing to suppress his confession. First, he claims that coercive police conduct, including lengthy interrogations *951 and police deception, rendered involuntary his confession and waiver of Miranda rights.[13] Second, he asserts that the delay in his initial appearance before a judicial officer resulted in an involuntary confession because he would have invoked his right to silence had his right to a timely hearing been honored. Third, he argues that the police violated his rights under article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (Vienna Convention), by failing to contact the Colombian consulate or advise him of his right to contact that consulate. He alleges that, had he been so advised, he would have availed himself of the advice of the consulate and, in turn, invoked his rights to counsel and silence.
The facts important to Conde's first grounds are as follows. Conde was arrested around noon on Saturday, June 24, 1995. Shortly after his arrest and transport to the Miami-Dade Homicide Bureau, Conde was informed of his Miranda rights; thereafter, Conde executed a waiver and consented to searches of his apartment and automobile. Two hours later, he also signed a consent to take saliva and blood samples. He was interrogated regarding the six murders for approximately twelve hours that day but denied any involvement in the crimes. The interrogation ended at 2:30 a.m., and Conde was taken to a detention facility, where he remained until approximately 2 p.m. the next day. Detectives met with Conde at that point and asked if he was willing to return to speak to them again. He agreed, they returned to the homicide bureau, and Conde was reinformed of his Miranda rights and executed another waiver. He then was interrogated for approximately two hours and fifteen minutes before asking to use a telephone. He spoke for approximately forty-five minutes with his grandmother, wife, and children, saying to them that he was "sorry for everything." When the interrogation recommenced, he admitted to killing all six victims. Over the course of the next two hours, he answered questions about each homicide. After Conde gave this initial statement, the detectives reviewed with him the sequence of events a second time in greater detail. Part way through this second statement, however, the detectives were advised that Conde would need to be transported to a bond hearing soon. At that point, a court reporter was summoned, and Conde gave a third statement, regarding all six homicides in chronological order, that was recorded as a 175-page stenographic confession. The interrogation on this second day terminated at 2:50 a.m. and had lasted approximately thirteen hours.
During the time that Conde was questioned and later confessed, he was placed in a standard police interview room and interrogated by three detectives with no more than two in the room at any time. He was provided food and drink, allowed restroom breaks, and given a jacket when he became cold. He spent at least eleven hours in a holding facility between the first and second day, during which time he had the opportunity to rest and reflect. He was informed of and waived his Miranda rights three times. And, when detectives discovered he was represented by an assistant public defender for another charge, he was again advised of his right to counsel, to which he responded, "No, I do not wish to speak to any lawyers."
In denying the motion to suppress, the trial court made the factual finding that Conde did not equivocate in any way on his decision to remain silent or *952 his right to counsel. Furthermore, having heard the testimony of the detectives involved, the trial court clearly rejected Conde's characterization of the facts of his interrogation as involving sleep deprivation, constant scrutiny, and rotating teams of interrogators using improper tactics. We find no error in the trial court's rejection of Conde's argument that the length of time and conditions of his interrogation rendered his confession involuntary. Here, as the above-noted facts indicate, the totality of the circumstances indicate that although Conde's interrogation was long, he was provided food, drink, access to restrooms, the opportunity to place phone calls, and at least eleven hours away from the detectives at a place where he could rest. These facts are similar to those in Chavez v. State, 832 So.2d 730, 748-49 (Fla.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 2617, 156 L.Ed.2d 637 (2003), in which this Court concluded that a confession was not rendered involuntary by the length of an interrogation totaling more than twice as many hours as that presented here and involving a shorter rest period. See also Walker v. State, 707 So.2d 300, 311 (Fla.1997) (voluntariness of confession upheld where defendant was questioned for six hours, provided drinks, and allowed use of restroom, and detectives never threatened capital punishment or promised more than to tell prosecutor that defendant cooperated); Roberts v. State, 164 So.2d 817, 819-20 (Fla.1964) (upholding voluntariness of confession where interrogation lasted from 6:30 p.m. to 1:30 a.m. on first day, defendant maintained innocence, interrogation began again after 9:30 a.m. on second day, and defendant showed no inclination to confess until confronted by accomplice).
In addition to the length of the interrogation, Conde points to one detective's statement during his interrogation that exaggerated the extent of DNA evidence against him. This Court has held that police misrepresentations alone do not necessarily render a confession involuntary. Escobar v. State, 699 So.2d 988, 994 (Fla.1997), abrogated on different grounds by Connor v. State, 803 So.2d 598 (Fla. 2001). The deceptiveness of the objectedto comment was minimal, as the police did have a preliminary, but not a one-on-one, match between the blood sample taken from Conde and the DNA evidence collected from the murders. That fact must be considered together with the totality of the circumstances, which indicate that Conde repeatedly signed waiver forms, rejected counsel, and gave his confession voluntarily. Given that Conde voluntarily provided the police with a blood sample within a couple of hours of his arrest, the existence or nonexistence of DNA matching does not appear to have been of great concern to him at the time. Thus, we conclude that his confession was not rendered involuntary as a result of coercive police practices or a misrepresentation of the strength of the DNA evidence.
We further reject Conde's argument that the trial court erred in denying the motion to suppress on the basis that the delay in his initial appearance before a judicial officer rendered his confession involuntary. When a defendant has been advised of his rights and makes an otherwise voluntary statement, a motion to suppress based upon a delay in following the requirements of Florida Rule of Criminal Procedure 3.130 requires proof that the delay induced the confession. Keen v. State, 504 So.2d 396, 400 (Fla. 1987), disapproved in part on other grounds by Owen v. State, 596 So.2d 985 (Fla.1992). In other words, prejudice must be proven on a case-by-case basis. As in Keen, Conde was advised of his rights to remain silent and to counsel on *953 numerous occasions. Nonetheless, he voluntarily waived those rights. Furthermore, the trial court made the factual finding that no evidence indicated that Conde equivocated in any way on his decision to waive his right to remain silent and his right to counsel. Thus, no prejudice has been shown here.
As for Conde's third ground for suppression, that the police violated his rights under the Vienna Convention, while we recognize that the United States Supreme Court has stated that "[t]he Vienna Convention ... arguably confers on an individual the right to consular assistance following arrest," Breard v. Greene, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998), we also conclude that suppression of a post-arrest statement is not an appropriate remedy for an alleged violation of article 36 of the Vienna Convention. See, e.g., United States v. Chaparro-Alcantara, 226 F.3d 616, 622 (7th Cir.2000); United States v. Cordoba-Mosquera, 212 F.3d 1194, 1196 (11th Cir.2000); United States v. Li 206 F.3d 56, 66 (1st Cir.2000); United States v. Page, 232 F.3d 536, 541 (6th Cir.2000). We conclude that even if Conde had standing to assert a right to consular assistance under the Vienna Convention and were to show that right was violated, this would not be grounds for suppression of an otherwise voluntary confession.

PENALTY PHASE

CCP
In the first of two subparts to his eighth claim, Conde asserts that the trial court erred in finding the aggravating circumstance that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). Conde argues that the State failed to prove beyond a reasonable doubt three of the four elements of CCP, that the murder was the product of "cold and calm reflection," that the defendant had a "careful plan or prearranged design," and that the defendant exhibited heightened premeditation. See Jackson v. State, 648 So.2d 85, 89 (Fla. 1994). The standard of review applicable to this issue is whether competent, substantial evidence supports the trial court's finding. Willacy v. State, 696 So.2d 693, 695 (Fla.1997).
Regarding "cold and calm reflection," Conde points to the opinion of his mental health experts that he committed the murder while in a disturbed state of mind, suffering from major depression, and unable to reflect upon his actions. Conde argues that the trial court improperly rejected this uncontradicted evidence despite its being consistent with his confession and the collateral crimes. In response, the State argues that the trial court properly concluded that Conde acted coldly, rather than out of emotional frenzy, and was permitted to reject Conde's mental health experts' testimony because "uncontroverted expert opinion testimony may be rejected where it is difficult to square with the other evidence in the case." Morton v. State, 789 So.2d 324, 330 (Fla.2001). The "cold" element of CCP is generally found wanting only in "heated" murders of passion in which the loss of emotional control is evident from the facts. Hertz v. State, 803 So.2d 629, 650 (Fla.2001), cert. denied, 536 U.S. 963, 122 S.Ct. 2673, 153 L.Ed.2d 846 (2002). Here, the trial court concluded that, although Conde's confession was contrary to the State's assertion that he committed the murder coldly and calmly, the court was entitled to reject that confession as "self-serving and unbelievable because it is contrary to the facts that could be inferred from the similar crimes evidence, or ... other facts adduced *954 at trial." The trial court found that calm and cool reflection, as opposed to emotional frenzy, was present in Conde's actions because his actions were spawned by his ongoing separation with his wife, which involved "feelings of sadness" but no "level of intensity of emotion." We find that competent, substantial evidence supports the trial court's conclusion. See Walls v. State, 641 So.2d 381, 387-88, 390-91 (Fla.1994) (judges have discretion to reject self-serving statements regarding claim of loss of emotional control where facts do not evidence such loss; finding trial court did not improperly reject expert opinion testimony of mental mitigation where facts were consistent only with some degree of emotional impairment).
Regarding the element of "careful plan or prearranged design," Conde argues that the trial court erred in relying exclusively on the similar crimes evidence to support its finding that the murder was calculated. As support, he cites to Finney v. State, 660 So.2d 674, 681 (Fla.1995), for the proposition that collateral crimes evidence alone cannot establish an aggravating circumstance. In Finney, this Court stated, "Even if it were permissible for a judge to rely on the circumstances of previous crimes to support the finding of an aggravating factor, such evidence, standing alone, can never establish, beyond a reasonable doubt, that the murder at issues was so aggravated." Id. at 681 (quoting Power v. State, 605 So.2d 856, 864 (Fla. 1992)). However, we further concluded in Finney that "collateral crime evidence should be used as evidence of an aggravating factor ... when [it] tends to prove a material fact necessary to establish [that] factor," id., and that no error resulted from the finding of an aggravating factor where other evidence in addition to the collateral crime has been relied upon. Here, although the trial court primarily relied upon the similar crimes evidence to conclude that Dunn's murder was the product of a careful plan or prearranged design,[14] this was not the only evidence upon which the court relied to find the aggravating circumstance of CCP as a whole. Furthermore, given the nature of the similar crimes evidence presented in this case (numerous, strikingly similar crimes), we find competent, substantial evidence exists to support the trial court's finding of a "careful plan or prearranged design" even in the absence of other evidence of calculation.
Finally, Conde alleges that neither the similar crimes evidence nor his confession provided sufficient evidence beyond a reasonable doubt that Dunn's murder was committed by "heightened premeditation." In respect to heightened premeditation, the trial court concluded:
[Conde] approached the victim from behind when he wrapped both arms around the victim's neck to strangle or choke her before she broke free and fought with him before he regained control and manually strangled her with tremendous force that fractured the victim's hyoid bone which is located in the interior depth of the neck. Relying on the similar crimes evidence and Conde's confession, heightened premeditation exists and is supported by the evidence as required by law.
We do not find error in this conclusion.

HAC
In the second subpart to his eighth claim, Conde argues that the trial court *955 erroneously found the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Acknowledging that this Court has repeatedly upheld trial court findings that strangulation is heinous, Conde asserts that this is only when the victim's consciousness during strangulation is established. Conde urges that the State's evidence in this case made it no more likely than not that Dunn was conscious when strangled. Cf. DeAngelo v. State, 616 So.2d 440, 442-43 (Fla.1993) (upholding trial court's rejection of HAC in strangulation case where evidence of consciousness was equivocal). Conde asserts that the evidence indicated the struggle between Conde and Dunn was brief and that the onset of unconsciousness would have been quick.
The trial court concluded in its sentencing order, "Strangulation with great force applied around the victim's neck after a violent beating until unconsciousness takes over [is] heinous, atrocious or cruel." This Court has stated that it is permissible to infer that strangulation perpetrated upon a conscious victim involves foreknowledge of death, causes extreme anxiety and fear, and is a method of killing to which heinousness is applicable. Tompkins v. State, 502 So.2d 415, 421 (Fla. 1986). Where a medical examiner testifies that death by strangulation is not instantaneous and the evidence supports a finding that the victim was not only conscious but struggling and fighting to get away, the murder is HAC. Id. Here, the medical examiner testified that Dunn's numerous defensive wounds, which included bruised knees and elbows, a fractured tooth, torn fingernails, and a bruise around the sensitive ear area, indicated a violent struggle and that Dunn was alive and conscious for some period of time while Conde was strangling her. The medical examiner also found brain swelling, indicating sustained pressure on the neck, and air hunger, which usually involves longer consciousness than those instances when the blood is completely cut off. Lastly, the examiner testified that Dunn suffered a broken hyoid bone in her neck, which may have led to neck swelling even after Conde released his grip, causing Dunn to experience air hunger longer than the twenty to thirty seconds Conde stated it had taken him to strangle her. The totality of this evidence provides competent, substantial evidence that Dunn was conscious for a period of time during which she struggled with Conde, sustained numerous bodily injuries, and likely knew her death was imminent.[15] We do not find error.

Mitigating Circumstances
Conde's ninth claim involves the trial court's rejection of two statutory mitigating circumstancesthat the crime was committed while under the influence of extreme emotional or psychological disturbance and that the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impairedand numerous nonstatutory mitigating circumstances regarding Conde's family background, childhood, and alleged physical, mental and sexual abuse. A mitigating circumstance must be "reasonably established by the greater weight of the evidence." Campbell v. State, 571 So.2d *956 415, 419 (Fla.1990). When a reasonable quantum of competent, uncontroverted evidence of a mitigating circumstance is presented, the trial court must find that the mitigating circumstance has been proved. Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990). However, a trial court's rejection of a mitigating circumstance should be upheld where the record contains competent, substantial evidence to support that rejection. Kight v. State, 512 So.2d 922, 933 (Fla.1987), disapproved in part on other grounds by Owen v. State, 596 So.2d 985 (Fla.1992).
In rejecting the statutory mitigating circumstance that the crime was committed while "under the influence of extreme emotional or psychological disturbance," the trial court stated that "[i]t is undeniable that [Conde] was experiencing difficulties in his marriage and exhibiting symptoms of depression before or during the murder of Rhonda Dunn," but rejected the opinions of Conde's three primary experts that he suffered from an extreme emotional disturbance. In so concluding, the court expressly relied upon the following evidence: (1) Conde's IQ of 109 and a personality test indicative of his good employment background, i.e., his ability to hold two jobs at the time of the Dunn murder; (2) his ability to establish meaningful relationships with his friends, co-workers, and family, including supporting two small children, during his separation and after the Dunn murder; (3) his personality test that did not show he was clinically depressed even after serving four years in jail; and (4) his express denial of depression at the time of the crime.
Where competent, substantial evidence exists to support a finding that the crime was committed upon "calm and cool reflection," the same evidence will often support a trial court's rejection of the statutory mitigating circumstance of extreme emotional disturbance. See Spencer v. State, 645 So.2d 377, 384-85 (Fla.1994) (citing same facts and testimony to support conclusions that trial court erred in finding statutory aggravating circumstance of CCP and in rejecting statutory mitigating circumstance of extreme emotional disturbance). Here, much of the evidence cited by the trial court to support its rejection of this mitigating circumstance invokes the same conclusion that the trial court relied upon to find that the crime was committed in a "cold" mannerthat Conde committed the murder at a time when he obviously was sad about his marital problems but otherwise functioned normally and, according to many witnesses, did not appear unstable. Indeed, competent, substantial evidence was presented on which the trial court could properly conclude that Conde was experiencing a difficult time in his life but had not exhibited signs of experiencing "extreme" emotional or psychological disturbance. We therefore do not find error in the trial court's rejection of this mitigating circumstance on the basis of this record. Similarly, we find that competent, substantial evidence in the record supported the trial court's rejection of the statutory mitigating circumstance that Conde's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired.
Regarding the sixty-one nonstatutory mitigating circumstances proffered by Conde, the trial court found many of them repetitive and regrouped them into twelve factors, out of which the court found five were established, including Conde's success in numerous aspects of life despite adversity,[16] good employment background, relationship with his children, mental and emotional problems at the time of the *957 crime, and status as a model inmate. Conde argues that the court erred in rejecting many of the others. Specifically, the trial court found no "credible or significant evidence" to support certain proffered mitigators related to Conde's family background, such as his father's "abandonment" of him at an early age and Conde's "violent, unsafe, unstable, and/or unpredictable" home and community environments as a child. The trial court also rejected the proffered mitigating circumstance of Conde's alleged physical, mental, and sexual abuse by family members. The court found the evidence supporting these claims to be controverted by other evidence that Conde's maternal and paternal grandmothers shared in his upbringing; he was provided a clean and loving home and adequate clothing and food; he was brought to the United States to live with his father; and according to his stepmother, whom the court found to be "quite credible," he was never abused or mistreated by her or his father. Given that much of the evidence regarding Conde's childhood was conflicting, we find no error in the trial court's decision to reject these proffered mitigating circumstances and rely instead upon the competent, substantial evidence that indicated Conde was loved and provided for as a child. It was certainly within the trial court's discretion to resolve this conflict in evidence. See Sireci v. State, 587 So.2d 450, 453 (Fla. 1991) (decision regarding mitigator lies with the judge, and "[r]eversal is not warranted simply because an appellant draws a different conclusion").

Admission of Details Regarding Prior Violent Felony
In the first of two subparts to his tenth claim, Conde asserts that the trial court erred in admitting detailed evidence regarding the aggravating circumstance of his prior violent felony, which occurred in April 1995 between the Dunn murder and Conde's arrest, when Conde broke into the home of a neighbor, raped her, and stole various items. In a trial held prior to the trial below, Conde was convicted of rape and burglary. The trial court below admitted, in the penalty phase only, the testimony of a detective about the facts of that offense. Conde acknowledges that the trial court properly admitted this prior conviction as proof of the aggravating circumstance of a prior violent felony but, relying upon Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), claims the court erred in admitting detailed testimony, particularly in light of Conde's offer to stipulate to the conviction. We conclude, however, that the trial court properly admitted the testimony because section 921.141(5)(b), Florida Statutes (1995), requires, as an element to be proven beyond a reasonable doubt, that the prior felony involved "the use or threat of violence." The details provided below were relevant to the threat of violence that Conde employed in the rape and burglary. Conde's reliance on Old Chief is improper, as was fully explained by this Court in Cox v. State, 819 So.2d 705, 716 (Fla.2002), cert. denied, 537 U.S. 1120, 123 S.Ct. 889, 154 L.Ed.2d 799 (2003). We, therefore, find no merit to this issue.

Admission of Evidence and Prosecutorial Arguments Regarding Collateral Crimes
In the second of two subparts to Conde's tenth claim, he argues that even if *958 the admission of the Williams rule evidence in his guilt phase did not require reversal, it does require new sentencing. Conde urges that the only likely impact on the penalty phase of the evidence and prosecutorial arguments regarding the other five murders was its inherent tendency to improperly suggest a recommendation of death based on bad character or propensity to commit murder. We reject this argument and hold, for the same reasons as discussed above, that the similar crimes evidence was relevant not only to the issues of identity and premeditation in the guilt phase but also to proving calculation and heightened premeditation as part of the aggravating circumstance of CCP and to counter claims of statutory mental mitigation in the penalty phase. Additionally, we note that the trial court expressly instructed the jury that the prior five homicides could not be applied as an aggravating circumstance.

Exclusion of Mitigation Testimony
In his eleventh claim, Conde argues that the trial court erred in excluding the proffered testimony of a jail chaplain in support of mitigation evidence of Conde's sexual abuse as a child. The chaplain was not listed as a witness for the defense, but his testimony was proffered on the fourth day of the penalty phase. The defense informed the court that the chaplain's testimony would be that, after Conde's arrest and four years prior to trial, Conde had confided to him about sexual abuse by a family member as a child. The defense argued that the testimony was newly discovered evidence and critical to corroborating Conde's claim of sexual abuse, as testified to previously by his psychotherapist Olga Hervis on the basis of her interviews with Conde. Upon the State's Richardson[17] objection, the trial court agreed that the late disclosure was inadvertent but excluded the chaplain's testimony on three grounds: that its admission would prejudice the State, the confession to the chaplain was "self-serving," and the testimony was cumulative of Hervis's testimony.
A trial court's decision on a Richardson hearing is subject to reversal only upon a showing of abuse of discretion. See State v. Tascarella, 580 So.2d 154, 157 (Fla.1991). The trial court applied the proper test for a Richardson hearing, analyzing whether intentional nondisclosure or prejudice to the other side was present. We find that even if the trial court erred in excluding the chaplain's testimony, the error was harmless beyond a reasonable doubt under the standard set forth in State v. DiGuilio, 491 So.2d 1129 (Fla.1986). We also note that the trial court properly admitted the chaplain's testimony at the Spencer hearing, where the possibility of prejudice to the State no longer existed.

Proportionality
In his twelfth claim, Conde argues that if this Court were to conclude that the trial court erroneously found CCP or HAC or erroneously rejected mental mitigation, his sentence of death should be found disproportionate and reduced to life imprisonment. This Court has noted that HAC and CCP are two of the most serious aggravating circumstances under the statutory sentencing scheme. See Larkins v. State, 739 So.2d 90, 95 (Fla.1999). Given Conde's prior violent felony conviction, this Court's affirmance of the trial court's findings *959 of HAC and CCP, and the trial court's assignment of only moderate to little weight to most mitigating circumstances found, together with the totality of the circumstances in this case excluding consideration of the collateral crimes, we conclude a sentence of death is proportionate relative to other capital cases. See Blackwood v. State, 777 So.2d 399 (Fla.2000) (death sentence proportionate where victim struggled for her life during manual strangulation and trial court found one aggravating circumstance (HAC), one statutory mitigating circumstance, no significant history of prior criminal activity, and eight nonstatutory mitigating circumstances); Hauser v. State, 701 So.2d 329 (Fla.1997) (death sentence proportionate where victim was strangled after engaging in sex with defendant for money and trial court found three aggravating circumstances of HAC, CCP, and pecuniary gain balanced against one statutory mitigator of no significant history of prior criminal activity and four nonstatutory mitigators).

Constitutionality of Florida's Capital Sentencing Scheme
Conde asserts that Florida's capital sentencing scheme violates the United States Constitution under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in Chavez v. State, 832 So.2d 730, 767 (Fla.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 2617, 156 L.Ed.2d 637 (2003), and denied relief. We find that Conde is likewise not entitled to relief on this claim. We specifically note that one of the aggravating circumstances present in this matter is a prior violent felony conviction.

CONCLUSION
For the reasons set forth above, we affirm Conde's conviction of first-degree murder and sentence of death.
It is so ordered.
WELLS, PARIENTE, LEWIS, QUINCE, and CANTERO, JJ., and SHAW, Senior Justice, concur.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
ANSTEAD, C.J., concurring in part and dissenting in part.
For the reasons I expressed in my opinion in Duest v. State, 855 So.2d 33, 52-57, 2003 WL 21467248 (Fla. June 26, 2003), I cannot agree with the majority's discussion of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In addition to the prior violent felony aggravating circumstance, which the majority notes is present in this case, the trial judge found the "heinous, atrocious, or cruel" and the "cold, calculated, and premeditated" aggravating circumstances and utilized them in imposing the death sentence. These two aggravating circumstances are, "of course, two of the most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So.2d 90, 95 (Fla. 1999).
Under these circumstances, it is apparent that the essential holding of Ring, that a death sentence cannot be predicated upon findings made by the trial judge alone, was violated.[18] It would be a cruel *960 joke, indeed, if the important aggravators actually relied upon by the trial court were not subject to Ring's holding that acts used to impose a death sentence cannot be determined by the trial court alone. The Ring opinion, however, focused on substance, not form, in its analysis and holding, issuing a strong message that facts used to aggravate any sentence, and especially a death sentence, must be found by a jury.
NOTES
[1] The names of the victims and the dates of their deaths were: Lazaro Comesana, September 16, 1994; Elisa Martinez, October 8, 1994; Charity Nava, November 20, 1994; Wanda Crawford, November 25, 1994; Necole Schneider, December 17, 1994; and Rhonda Dunn, January 13, 1995. Each died of asphyxiation.
[2] Williams v. State, 110 So.2d 654 (Fla.1959).
[3] Spencer v. State, 615 So.2d 688 (Fla.1993).
[4] Conde alleges reversible error in the guilt phase for the following reasons: (1) the trial court erroneously denied Conde's cause challenges to six prospective jurors; (2) the trial court erred in granting the State's motion to strike prospective juror Aguirregaviria for cause; (3) Conde's motion for judgment of acquittal was erroneously denied by the trial court; (4) the trial court erroneously admitted Williams rule evidence of the other five murders; (5) the trial court erred in admitting testimony regarding (a) Conde's aggravated battery upon and false imprisonment of another victim in a collateral crime, (b) a police officer's warning to Dunn about the series of murders, and (c) Conde's alleged flight at the time of his arrest; (6) the trial court erroneously failed to limit certain prosecutorial comments during the guilt-phase opening and closing arguments; and (7) Conde's motion to suppress his confession was erroneously denied by the trial court.
[5] Conde alleges reversible error in the penalty phase for the following reasons: (1) the trial court erred in finding the CCP and HAC aggravating circumstances; (2) the trial court erred by rejecting certain mitigating circumstances; (3) the trial court erroneously allowed the admission of details regarding Conde's prior violent felony and evidence and prosecutorial arguments regarding collateral crimes; (4) the trial court erred by excluding mitigation testimony on the basis of a discovery violation; (5) there was a lack of proportionality regarding his death sentence; and (6) Florida's capital sentencing scheme is unconstitutional.
[6] Conde further asserts that the trial court committed error by denying his cause challenge to Groom on the basis that Groom failed to include information about two arrests in his questionnaire and failed to fully reveal information about those arrests when discussed during voir dire. Prior to jury selection, Conde received Groom's arrest record and partially based his cause challenge to Groom on that information. Defense counsel argued that because Groom was not candid, the Court should excuse him for cause. We conclude that any nondisclosure by Groom was not material to the degree that the denial of a cause challenge was an abuse of discretion. Cf. Lebron v. State, 799 So.2d 997, 1014 (Fla.2001) (juror's nondisclosure warrants new trial only where information was relevant and material to jury service in the case, juror concealed the information, and failure to disclose was not attributable to counsel's lack of diligence).
[7] In so holding, we note that Conde was permitted to peremptorily challenge Rolle, who therefore did not sit on the jury.
[8] Having lost his argument regarding the collateral crimes evidence, Conde thereafter moved to consolidate the counts for trial, despite the fact that they were originally severed on his own motion. The trial court granted the consolidation, and the State appealed. The Third District held that in ordering the charges reconsolidated, the trial court abused its discretion because the murders were not sufficiently related in time, place, or manner to be tried together under Florida Rule of Criminal Procedure 3.150. State v. Conde, 743 So.2d 78, 79 (Fla. 3d DCA 1999). The Third District did not review the trial court's decision to admit the collateral crimes evidence at a severed trial but did note that, although the offenses were separate episodes requiring separate trials, they were "similar crimes." Id. at 79-80.
[9] Conde further argues that other evidence relating solely to Dunn's murder, such as his confession and Dunn's blood in his apartment, was sufficient to establish these material facts without the introduction of prejudicial collateral crimes. However, we note that this Court has upheld the admission of Williams rule evidence where that evidence corroborated independently strong evidence, including witness testimony and confessions. See Randolph v. State, 463 So.2d 186, 189 (Fla.1984) (corroboration through modus operandi evidence was necessary to support State's chief witness to crime, a self-declared prostitute); Ashley v. State, 265 So.2d 685, 692-94 (Fla. 1972) (affirming admission of collateral crime evidence to prove identity, among other material facts, even though eyewitness testimony, the defendant's confession, and ballistics evidence linked accused to crime for which he was on trial).
[10] For example, photos were introduced to show tire print evidence, a recurrent positioning of the bodies upon disposal, the typical area in which they were left, and the lividity patterns of each body, which indicated it had been initially on its back and then turned face down.
[11] For example, in closing argument the prosecutor urged the jury to find that Conde intended to kill Dunn because he had previously murdered in the same manner and asked the jury: "You don't think he knew what was going to happen to Rhonda Dunn? You don't think when he put his arm around her neck that he knew he was going to suffocate her just like all the others[?]"
[12] Conde argues error in the prosecutor's reference to Conde as an adulterer and sociopath and the prosecutor's alleged personal attacks on defense counsel. We note that the trial court remedied the former by a curative instruction. See Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985). Regarding the latter, we find that the essential premise of the prosecutor's argument, that the defense's focus on certain issues was designed to lead the jury down the wrong road, was not improper. See Rimmer v. State, 825 So.2d 304, 324 n. 16 (Fla.), cert. denied, 537 U.S. 1034, 123 S.Ct. 567, 154 L.Ed.2d 453 (2002).
[13] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[14] Specifically, the court noted the "sequence" of these crimes and how Conde "carefully picked the victim who was a prostitute and lured her back to the safety and quiet of his apartment for sex and then proceeded to strangle her."
[15] We also reject Conde's argument that, because there was no evidence indicating he had a desire to inflict a high degree of pain or enjoyed Dunn's suffering, HAC cannot be established. As we stated in Barnhill v. State, 834 So.2d 836, 849-50 (Fla.2002), "HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death."
[16] Numerous proffered factors were combined within this established mitigator, including that Conde was a good student, wellbehaved child, positive role model to family, children, and friends, and good provider.
[17] Richardson v. State, 246 So.2d 771, 775 (Fla.1971) (requiring court to determine if violation of rule relating to exchange of witness lists was inadvertent or willful, whether violation was trivial or substantial, and what effect, if any, it had upon ability of other party to properly prepare for trial).
[18] Moreover, I do not find the majority's citation to Chavez v. State, 832 So.2d 730 (Fla. 2002), as providing a valid explanation for why we may reject the defendant's Ring claim. The only discussion of Ring in Chavez was an unelaborated reference to the fact that we had rejected similar contentions in the plurality opinions in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002).