DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ANTHONY BRYANT,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D07-4029

[February 10, 2016]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Martin J. Bidwill, Judges; L.T. Case No. 01-16577 CF10C.

Hilliard E. Moldof, Fort Lauderdale, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Don M. Rogers, Assistant Attorney General, West Palm Beach, for appellee.

CONNER, J.

Anthony Bryant appeals his judgment and life sentence after he was found guilty of first degree murder. He argues the trial court erred in refusing to exclude DNA evidence linking him to the crime. The results of the DNA testing were not disclosed to him until *after* his trial commenced, despite the fact that the State had the pants from which the DNA was obtained in its custody for almost six years *before* trial. Because the trial court applied the correct remedies to cure the procedural prejudice created by the late production and disclosure of evidence, we affirm.

*Factual Background and Trial Proceedings*

On July 16, 2001, officers responded to the home of the Victim in reference to a report of a dead body. When officers arrived, they found the Victim had been brutally murdered. The autopsy revealed the Victim died as a result of blunt force trauma to the head.

The investigators spoke to a friend and co-worker of the Victim, who had discovered the Victim's body. The friend stated that he spoke to the

Victim late on Friday, July 13, 2001, but the Victim did not arrive for work on July 14th or 15th. He also told investigators that the Victim had three house guests staying with him, two males and a female. The co-worker did not know anything about the identity of the house guests. The Victim's cousin told investigators that her nephew (Bryant), his girlfriend (Cannon), and another man (Blash), were staying with the Victim while visiting from Connecticut.

Investigators contacted a detective in Connecticut, and the detective informed them that they were investigating Bryant, Cannon, and Blash for a murder in Connecticut, and that they had been in contact with investigators in New York, where Bryant, Cannon, and Blash were also being investigated for a separate attempted murder. Investigators obtained photographs of Bryant, Cannon, and Blash. The Victim's friend identified all three as the house guests who were staying with the Victim just prior to his death. Officials in New York eventually apprehended Bryant and his co-defendants.

In October 2001, a grand jury returned an indictment charging Bryant, Cannon, and Blash, with first degree murder and conspiracy to commit first degree murder. The State gave notice it was seeking the death penalty.

The specific issue on appeal concerns the admission of DNA evidence at trial obtained from a pair of pants found in a bedroom in the Victim's home. The results of DNA testing by the State revealed that the pair of pants contained DNA from the Victim, in the form of blood spatter, and also contained the DNA of Bryant. The problem we address on appeal is that the DNA testing by the State was not completed until thirteen days after jury selection began, despite the State having custody of the pants as evidence for almost six years before the trial began. Bryant asserted a discovery violation and moved to exclude the DNA evidence. As discussed more fully below, the DNA evidence was important because both the State and Bryant argued that the "owner" of the pants was "intimately" involved in the murder.[1]

The easiest way to understand the pertinent factual information for our appellate analysis is to employ a timeline description of events applicable

---

[1] There was non-DNA evidence presented by the State against Bryant, but there is no assertion by the State on appeal that *if* the admission of the DNA evidence was error, the error was harmless. Thus, there is no need to discuss the other evidence.

to the trial court's decision to deny Bryant's motion to exclude the DNA evidence.

*Timeline of Dates Pertinent to the Richardson[2] Hearing Analysis Regarding the Cure for Prejudice Caused by Late Disclosure*:

*July 16, 2001*: The victim's body found at his home.

*May 13, 2005*: The Broward County Sheriff's Office ("BCSO") lab received the pants.

*April 26, 2007*: Bryant filed a demand for a speedy trial. Trial is set to begin on June 14, 2007.

*May 15, 2007*: Noppinger (State's DNA expert) received a request from the State to put a rush on the examination and analysis of the pants.

*Between May 15, 2007 and June 12, 2007*: Noppinger worked on other cases and did not test the pants.

*June 12, 2007*: Noppinger began to work on the DNA testing of the pants.

*June 13, 2007*: State advised Bryant DNA testing is being conducted and results will be provided to the defense as soon as they are received.

*June 14, 2007*: Jury selection began.

*June 27, 2007*: Noppinger completed the DNA testing and finished the nine-page report that was given to Bryant on that date, as well.

*June 28, 2007*: Bryant deposed Noppinger.

*June 29, 2007*: Bryant requested a *Richardson* hearing. Hearing was continued for additional evidence.

*July 3, 2007*: *Richardson* hearing resumed. Bryant submitted testimony of two local defense attorneys who had similar issues with receiving late DNA discovery. For its explanation

---

[2] *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

on the late discovery of the results, the State informed the court that it met with the lab two years prior, and thought that the DNA tests were being conducted; however, it later discovered that the test had not been conducted. The State agreed that this was a case of negligence, but denied any willful attempt to thwart the discovery process. The State argued that it informed Bryant, before trial started, on June 13, 2007, that DNA tests were being conducted, and that the results would be forthcoming. Bryant acknowledged receiving this supplemental discovery advising that the results would be disclosed in the future. The State recommended a recess or a mistrial as a remedy.

Relying on *State v. Trummert*, 647 So. 2d 966 (Fla. 4th DCA 1994), the trial court found that there was no discovery violation; but that if there was a discovery violation, it was not willful, but was substantial and there was procedural prejudice to Bryant based on the late disclosure. As to what the remedy would be to cure the prejudice, the trial court denied Bryant's request to exclude the evidence as too extreme, but stated that, at the least, a recess would be granted in order for Bryant to have time "to do whatever it is they [the defense experts] think they need to do."

The trial court asked Bryant if he wanted a mistrial. Bryant responded that he was "impressed" with the jury panel and "believe[d]" in that panel, and so did not accept or request a mistrial at that time.

The trial court recessed the *Richardson* hearing, while the trial was ongoing, for Bryant to contact his expert witness to provide further information regarding when and where to send the pants for DNA analysis by the defense.

*July 6, 2007*: Status hearing was held, while the trial was ongoing, where the State informed the trial court that the samples from the pants were packaged and ready to be shipped to the lab of Bryant's choosing. The trial court again asked Bryant if he was requesting a mistrial, and he again stated that he was not, at that time.

*July 13, 2007*: Status hearing was held, while the trial was ongoing, where the trial court stated that there were several of the jurors that had upcoming conflicts in scheduling, and

4

therefore, recessed the trial until August 7, 2007. The trial court asked Bryant if he was requesting a mistrial, and Bryant stated that he wished to speak to his family about it first, and therefore, he would later inform the trial court of his decision regarding whether he was requesting a mistrial.

*July 17, 2007 (morning session)*: In a status conference during the trial recess which included a J.A.C.[3] representative (via telephone in open court), in an effort to determine whether the J.A.C. would cover the cost of Bryant testing the pants, the trial court addressed the fact that Bryant now wished to send the pants to the California lab (instead of just having the lab test samples of the pants similar to the samples previously tested by the State). The trial court suggested that the pants be sent with a deputy to watch over them, and Bryant agreed with that solution.

*July 17, 2007 (afternoon session)*[4]: At the beginning of the status conference, the State indicated that it contacted the Sheriff's Office and made arrangements for a deputy to escort the pants to California, and hoped that the pants would arrive at the California lab the following Monday. Additionally, the court conducted a phone conference with Keel, one of Bryant's DNA experts. During the discussion, it was established that the defense lab would not consent to the deputy being present while the testing was conducted. It was decided that a deputy would deliver the pants to the lab and wait until the testing was finished in order to promptly return the pants to Florida. With regards to the possibility that additional testing would be needed, the following discussion occurred:

> THE COURT: You know, that's just the way it is. And if something happens *and we have to revisit it*, we have to revisit it. I mean, I don't know what

---

[3] The J.A.C., or Justice Administrative Commission, "provide[s] compliance and financial review of billings for services provided by private court-appointed attorneys representing indigent clients and associated due process vendors." Justice Administrative Commission, https://www.justiceadmin.org/home.aspx (last visited Dec. 30, 2015).

[4] This is the portion of the record that Bryant continuously referenced, at oral argument, as containing his request for more than a day for the pants to be sent to California.

to tell you on that.  I mean, I don't think -- I think everyone is trying to come to a happy medium here that's allowing the defense to do what they need to do and allowing the state to maintain the integrity of the evidence and the custody of an officer of the Sheriff's Office and, you know, as I said, Mr. Ke[e]l or Dr. Ke[e]l -- I don't know his education.

[DEFENSE COUNSEL]: He is not a doctor.  He is a criminologist.

THE COURT: I don't know *if he needs to come back and convince me that that needs to happen, that I can order it.*  I don't see any other way to do it other than him coming here, which would be probably prohibitively expensive and create lab issues, so I don't see any other way to do this.

[STATE]: Well, knowing based on what Mr. Ke[e]l said, I would encourage him to take as many samples –

THE COURT: I would to [sic].  Because I will tell you, we are getting to the point that given the five weeks -- you work it out with him, however you want to do it.

[DEFENSE COUNSEL]: Judge, I'm willing –

THE COURT: You have been open and everyone has and that is obvious to me.  But he needs to do whatever he can with it to maximize the chances that *he does not need it back.*

(emphasis added).  Bryant made no request for a further continuance of the trial at this status conference.

*August 6, 2007*: The parties reconvened for a status conference on the last day of the trial recess period.  The parties informed the trial court that the pants left the BCSO lab on July 20, 2007, escorted by a deputy, arrived in California on July 24, 2007, and the deputy picked up the

pants from the California lab the next day, July 25, 2007. During the status conference, a telephone call was made by the court to Keel and Blake (another DNA expert from the same lab). Blake mentioned that he needed more time with the pants, or the DNA profiles of other individuals, or both. Bryant's counsel *did not* follow Blake's comment with a motion or request for a continuance to conduct further testing. Instead, Bryant's attorney actually made several express assertions that he did not have any issues with the procedure, and was ready to continue to trial.

When the trial resumed, Noppinger testified for the State about DNA evidence. He testified that he had collected known samples from Bryant, Blash, and the Victim, and determined that the blood stains on the pants belonged to the Victim. He also testified regarding a more controversial "yellowish" stain in the area in the "inside front portion on the right side [of the pants] next to the zipper location of the pants." Although he conducted a test to determine if the stain was semen, the test came back negative. He could not identify the substance of the stain after conducting further tests. Noppinger stated that the stain yielded a partial profile, from which Bryant could not be excluded.

In order to determine the "owner"[5] of the pants, Noppinger took a Q-tip swab from the waistband of the pants, but stated that he did not find any useable evidence from that area. He also stated that he did not conduct an alternate light source test on the pants, where a light would be used to detect substances that may be present but unable to be seen with the naked eye.

Bryant called Keel as his DNA expert witness. Keel testified that he was originally sent two known DNA samples from Bryant and the Victim, and two pieces of the pants cut by BCSO. So, he first did a presumptive test on the yellow-stained area, and the test yielded a negative result for semen, and a small amount positive for blood. When testing the stain for DNA, he found two contributors: one, Bryant, was the major contributor, and then there was a second, unknown (*not* Blash) contributor. However, since Keel

---

[5] Noppinger also explained what it meant that he was looking for the "owner" of the pants by testing the waistband of the pants: he was looking "in places that if somebody was wearing this particular item of clothing we can find the DNA." Although the significance of this was not made immediately apparent, since Noppinger found only Bryant's DNA on the pants, based on Bryant's analysis of the pants, and finding multiple DNA sources on the pants, this idea of "ownership" of the pants became important.

wanted to conduct further tests, and since the BCSO only sent him cuttings from the pants, he requested that BCSO send him the pants in the entirety.

Keel testified that, when he received the pants, he also tested multiple other areas on them, and found multiple areas on the pants where Bryant was a major contributor, but there were two or more unknown contributors to the sample. Keel testified to the significance of these findings, particularly the fact that there were multiple DNA-contributors found on the pants. Keel stated that "most of the time" when an attempt is made to find the "owner" of a pair of pants, there is only one contributor. Keel stated that he could not tell who was wearing the pants at the time that the Victim was murdered, based on the DNA results, and just because Bryant was found to be the major contributor of DNA on the pants, did not necessarily mean that he was the person wearing them at the time of the murder.

At the end of the trial, the jury found Bryant guilty of first-degree murder. The jury recommended a life sentence, which the trial court imposed. Bryant gave notice of his appeal.

*Appellate Analysis*

The sole issue on appeal is whether the trial court erred in failing to exclude the DNA results after the *Richardson* hearing. "[A] trial court's decision on a *Richardson* hearing is subject to reversal only upon a showing of abuse of discretion." *Rimmer v. State*, 59 So. 3d 763, 787 (Fla. 2010) (citing *Conde v. State*, 860 So. 2d 930, 958 (Fla. 2003)).

The trial court was correct that the facts of the instant case are similar to the facts in *Trummert*. 647 So. 2d at 967. In *Trummert*, the State appealed a trial court's order excluding DNA evidence that was disclosed just prior to trial. *Id.* After ordering the State to produce the results of a DNA analysis on two separate occasions, just before the deadline of the second order to produce, the State requested a continuance, and for samples to be taken of Trummert's blood, since it learned that the previous prosecutor on the case had not requested the DNA testing. *Id.* Soon after, on March 31, 1994, the State requested a two-month continuance to complete the DNA testing and to depose a defense witness. *Id.* The trial court granted the State's request, over the defense's objection. *Id.*

On April 7, 1994, Trummert filed a demand for speedy trial, and at the calendar call, the State provided Trummert with the new evidence of the DNA analysis, in addition to a new witness who would testify about the

8

evidence.  *Id.*  Trummert moved to exclude the results of the DNA testing, as well as the witness, "argu[ing] that the state's late production put her in the position of either giving up her right to a speedy trial, or proceeding with further discovery on the evidence just handed to her."  *Id.*  The trial court granted Trummert's motion, excluding the DNA analysis and witness.  *Id.*

On appeal, the State argued:

> The state concedes that providing DNA analysis results to the defense four days before the running of the speedy trial period prejudiced the defense in that it would have been difficult for the defense to prepare for trial.  The state also does not dispute that the defense was entitled to a "just remedial order."  However, the state maintains that the *Richardson* doctrine does not apply as there was no discovery violation because it presented the report to the defense as soon as it was available and that exclusion was too harsh a sanction.  The state suggests that a short court continuance was the proper remedy.

*Id.* at 967-68.  While reversing the trial court's order excluding the DNA evidence and the witness, we explained:

> As in [*State v.*] *Hutley,* [474 So. 2d 233 (Fla. 4th DCA 1985),] the short additional continuance required to complete DNA testing, documentation, and disclosure to appellee would not impinge on the defendant's constitutional right to a speedy trial.

> What we have is the state's negligent failure to proceed with DNA testing at an earlier time.  *This is not a discovery violation.* While some type of sanction may be appropriate for the prosecution's shortcomings, the interests of the citizens of the State of Florida should not be jeopardized by imposing the extreme sanction of exclusion of what may well be crucial evidence, particularly where the only prejudice to the accused is a slight additional delay.  *Nor do we think the speedy trial rules are to be used to curtail essential trial preparation or to exclude evidence produced by that preparation in the absence of a serious discovery violation.*  Under such circumstances the state should have been granted a continuance for a reasonable time.

*Id.* at 968 (emphasis added). Therefore, under facts similar to the instant case, we held that the delayed production and disclosure of DNA evidence was *not* a discovery violation.

However, Bryant argues that *Trummert* is not controlling because the facts are different from the instant case. Notably, in *Trummert*, the evidence was disclosed to the defense prior to trial, albeit very close to the trial date, whereas in the instant case, the evidence was disclosed to Bryant *during* the trial. This distinction, however, does not change the analysis. Although the disclosure in the instant case of the actual results was later in the process, the same issues are present in regards to whether the late discovery was a violation. The State disclosed the DNA results to Bryant as soon as it had them, and also kept Bryant updated as to the fact that the DNA testing was being conducted and it would soon have the results. Therefore, Bryant was at least aware that the results would be forthcoming, although he may not have been aware of exactly what those results would reveal.

While the exclusion of evidence is a permissible tool in a trial court's remedial cure arsenal, the trial court correctly determined that "this sanction should only be imposed when there is no other adequate remedy." *McDuffie v. State*, 970 So. 2d 312, 321 (Fla. 2007). Although the State agreed that Bryant was procedurally prejudiced by its late disclosure of evidence, the trial court's remedy of allowing a long recess in order for Bryant to conduct testing cured this prejudice.

Bryant makes two arguments to demonstrate procedural prejudice: (1) he looked like a "liar" in his opening statement since he insinuated that there was no DNA linking him to the murder, and (2) his inability to prepare fully for the trial since the DNA evidence was not provided to him until the trial was almost half over. We reject both arguments. Since both claims of prejudice were cured by the remedy granted by the trial court, the trial court properly declined the motion to exclude the DNA test results.

Regarding Bryant's first argument that the jury would think that he was untruthful or somehow negligent in implying that there would be no DNA evidence in the case to link Bryant with the Victim's murder, the record shows that the trial court allowed both parties to give a second opening statement after the five-week long trial recess. The remedy allowed both sides to take into account the new evidence from *both* experts. Although the trial court would not allow Bryant to tell the jury that the delay in the new evidence was due to the negligence of the State or the investigators, Bryant was able to explain why his former implication, that there was no DNA evidence, was no longer true. Thus, in opening

statements, the jury was informed about the new DNA evidence and Bryant was able to avoid the appearance that he was lying, misrepresenting the facts, or overlooking an important piece of evidence.

Regarding Bryant's second argument that he was unable to fully prepare for trial with the disclosure of new DNA evidence, not only did the trial court allow Bryant to take depositions of the State's DNA expert during the trial, but the trial court actually recessed for five weeks, to allow Bryant to conduct multiple tests on the pants. At first, the State sent Bryant's DNA experts only two pieces of the pants. However, after testing those pieces and requesting the entirety of the pants, Bryant's experts also had the opportunity to test multiple portions of the pants and to make an independent conclusion after this access to the pants. The five-week continuance, coupled with the opportunity for further testing, demonstrates the trial court adequately addressed the claims of prejudice due to insufficient time to prepare to defend against the State's new DNA evidence.

On appeal, Bryant contends that the trial court should have allowed his experts more time to conduct further testing on the pants. However, in viewing the record, and specifically the areas to which Bryant has directed us on appeal, in his brief and during oral argument, we find nothing to show such a request was made to the trial court for an additional continuance for more testing. Although there is a portion of the transcript of one of the status conferences where Blake stated that "the story that these pants have to tell cannot be fully told without that information [from additional testing]," there was never a specific request for an additional continuance made by Bryant to the trial court. Additionally, prior to the testing of the pants, Keel stated that he wanted the detective to bring the pants to his lab, drop them off, then come and pick them up once he was finished. Although the State did not agree to leave the pants at the lab, the trial court specifically stated that "if [Keel] needs to come back and convince me that that needs to happen, [then] I can order it." The trial court did not state that the "it" in this situation was more time to analyze the pants; however, from the context of the discussion ("he needs to do whatever he can with it to maximize the chances that he does not need it back"), we are satisfied that the trial court certainly left the possibility open that it may need to order that Keel be allowed more time with the pants. But, given the fact that the record is devoid of any statement by Bryant, specifically requesting that Keel be granted more time with the pants, the trial court's offer to reconsider the issue was never raised.

The trial court also offered multiple times to grant a mistrial. We are satisfied the offer was made to address any defense concerns that additional DNA testing was needed. In response, Bryant repeated multiple times that he did not want a mistrial, and that he wanted to keep the jury panel he had because he was "impressed" by the panel. The defense may have had strategic reasons for not specifically requesting any further continuance.[6] Thus, the remedy employed by the trial court allowed Bryant to have his proverbial cake and eat it too; not only was he granted an extended period of time to conduct tests on the pants, but he was also able to keep the jury panel that he was so desirous of maintaining.

We conclude that the extreme sanction of exclusion of evidence was not warranted in this case. Moreover, the remedy fashioned by the trial court cured any procedural prejudice to Bryant resulting from the newly-furnished DNA results. The remedy of a recess was not only appropriate given the specific facts of the instant case, but it has also been recognized as a generally fitting remedy for situations involving late disclosure of newly-discovered evidence. *See Livigni v. State*, 725 So. 2d 1150, 1151 (Fla. 2d DCA 1998) ("[O]ften a very brief recess, during which the parties work cooperatively to address the situation, provides sufficient preparation for the newly discovered evidence. However, where there is no willful discovery violation, the court should not consider sanctions. Here, the trial court erred by imposing the sanction of exclusion because there was no showing of a discovery violation.") (internal citation and quotation marks omitted); *Hernandez v. State*, 572 So. 2d 969, 971 (Fla. 3d DCA 1990) ("[P]rejudice may be averted through the simple expedient of a recess to permit the questioning or deposition of witnesses. . . . Thus, it is an abuse of discretion for a trial judge to invok[e] the severe sanction of prohibiting the defense from calling . . . witnesses instead of granting a recess and allowing the prosecutor to interview the witnesses and satisfy himself as to whether the prosecution would be prejudiced by the witnesses being allowed to testify." (internal citation and quotation marks omitted) (quoting *S.G. v. State*, 518 So. 2d 964, 966 (Fla. 3d DCA 1988))). It was also a remedy mentioned by this court in *Trummert*, faced with a very similar set of facts. 647 So. 2d at 968 ("Under such circumstances the state should have been granted a continuance for a reasonable time.").[7]

---

[6] There is the distinct possibility that "the story that these pants have to tell" would be more harmful than helpful to the defense.

[7] Bryant also argued on appeal that a continuance or mistrial would have forced him to abandon his right to a speedy trial. However, this argument was also addressed, and rejected, in *Trummert*. 647 So. 2d at 968 ("Nor do we think the

Even though we are affirming the trial court in this case, it is important to address what appears to be a recurring problem that was brought to light by this case: the repeated tardiness by the Broward County Sheriff's Office lab in producing DNA testing results to those charged with criminal offenses.

As stated above, the facts of this case are similar to the facts in *Trummert*. However, there is one important additional fact in the instant case that apparently was not present in *Trummert*: a demonstrated pattern of late disclosures of DNA test results, as testified to by other defense attorneys involved in other cases. It is important to note that in *Trummert*, we stated that the situation "we have is the state's *negligent* failure to proceed with DNA testing at an earlier time. This is not a discovery violation." *Id.* at 968 (emphasis added). The record in *Trummert* did not disclose a pattern of late disclosures.

Although the negligent failure to conduct timely DNA testing may have saved the State from a finding that there was a discovery violation in this case, similar to *Trummert*, the facts of the instant case come dangerously close to shifting the State's actions from negligent to willful. Although the State did not deliberately fail to get the DNA on the pants tested sooner, based on the testimony at the *Richardson* hearing by other defense counsel, it seems that this is not the first time that the Broward County Sheriff's Office lab has been late with DNA testing and furnishing the results. The fact that the State is aware, or at the least, should be aware, that this problem is on-going, puts it on notice that there is an issue. A "willful" act denotes an intentional act. *See* BLACK'S LAW DICTIONARY (10th ed. 2014). Although the late testing of the pants was not intentional, the fact that the State is now well aware of the tardy testing issues with the lab, it should not be able to ignore known deficiencies in the future.

The failure of the State, or its agents, to address known deficiencies regarding tardy or late DNA testing leads to recurring prejudicial results affecting a multitude of cases. Just as the State would argue that willful blindness is not a valid defense to many crimes, the same principles apply to its ignoring the obvious deficiencies with obtaining DNA test results.

Therefore, although the facts of this case do not require reversing Bryant's conviction based on the State's actions, in future cases it may be

speedy trial rules are to be used to curtail essential trial preparation or to exclude evidence produced by that preparation in the absence of a serious discovery violation.").

13

appropriate for the trial court to take the State's, or its agent's, pattern of tardy or late disclosures into consideration when determining whether there has been a discovery violation and what remedy to fashion, if in fact the trial court is satisfied, based on the evidence, that there is such a pattern of tardy or late disclosures.  Because until the State is held responsible for the repercussions of its actions, the problem of tardy or late disclosure of DNA evidence will continue to the detriment of due process.

*Affirmed.*

WARNER and GROSS, JJ., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***